People of the State of Illinois, Plaintiff-Appellee, v. Eugene Marino, et al., Defendants-Appellants.

Gen. No. 50,956.

First District, First Division.

May 13, 1968.

Rehearing denied June 12, 1968.

371

Frank G. Whalen, of Chicago, for appellants Frank Rago, John Monteleone, and Angelo Pettit.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Zagel, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ADESKO delivered the opinion of the court.

The above-named defendants were indicted for the offense of theft in that they knowingly obtained and exerted unauthorized control over certain property of the Louis Zahn Drug Company, intending to permanently deprive the owner of the use and benefit of said property in violation of the Criminal Code. (Ill Rev Stats 1963, c 38, § 16-1(a).) Upon trial by jury, Robert Vaughn was found not guilty. The other four were found guilty as charged. Marino has filed a separate appeal, No. 51,023. Rago, Monteleone and Pettit, who will at times be collectively referred to as "defendants" prosecute this appeal together.

Defendants raise the following points on appeal:

1. The Court erred in denying their motion to suppress;

2. The Court erred in permitting improper and prejudicial conduct in cross-examining the Court's witness, Officer Prokop;

3. The State was guilty of prejudicial conduct in repeatedly attempting to impeach its own witness Sgt. McLean;

4. The State was guilty of prejudicial conduct in argument to the jury and the Court erred in failing to rule on objections made by the defendants;

5. The State failed to prove the defendants guilty beyond a reasonable doubt and to a moral certainty;

6. The Court erred in permitting the State to prove by State's witness Nowak that she could not say defendants were not on the premises;

7. There was a fatal variance between the proof and the indictment;

8. Defendants were prejudiced by improper publicity before and during the trial;

9. Defendants were deprived of a fair and impartial trial;

10. The State failed to prove that the fair cash market value of the goods at the time of the theft exceeded $150.00; and

11. The Court erred in refusing to conduct a hearing in mitigation.

Robert Brown was an employee of the Louis Zahn Drug Company. He was in charge of storing merchandise in the Zahn warehouse located in Melrose Park. On Friday, October 4, 1963, he received a trailer of Mead Johnson pharmaceuticals, but because of the lateness of the hour, unloading the trailer was delayed until Saturday. On Saturday, Brown started the unloading process. The top cartons of each stack were marked either "E–24" or "E–25" with a brush type pen. This was so the other employees would know where to place the boxes in the warehouse. About 80 percent of the trailer was unloaded and stacked on an enclosed loading platform when Brown left the warehouse on Saturday night. He checked and locked all the doors and activated the alarm system.

On Monday morning, Brown reported to work to find the merchandise that had been on the loading platform was missing, as well as the Mead Johnson trailer. The police were notified and subsequently on April 13, 1964, they recovered and returned certain merchandise back to the Zahn Warehouse. Brown identified 25 of the cartons

as containing his warehouse location markings. Brown, who had experience in pharmaceutical ordering and merchandising, testified that the fair cash market value of the 25 marked cartons was $3,000.

Eugene Marino owned a home on a residential street in the North end of Northlake, Illinois. There was a driveway along the West side of the house, leading to a two-car garage. On April 13, 1964, a neighbor of Marino's, Mrs. Helen Nowak, observed Marino and three other persons in Marino's backyard. She testified for the State at the hearing on the motion to suppress and in the main trial that Marino opened his garage door and the other men started hurriedly loading cartons into a truck which was parked in the driveway. Mrs. Nowak further testified that this looked suspicious to her so she called Chief Heggaton of the Northlake Police. She saw the police arrive and fire shots at the men who ran when they were ordered to halt. The police chased after the men as they jumped over the back fence. Mrs. Nowak put in a second call to the police and then returned to her window. She saw Marino run from the garage to his house and later emerge with his hair ruffled and his shoes untied.

Mrs. Nowak could not identify any of the men who were in the backyard, except Marino. At the trial, she identified defendant Rago as the man who was captured by Sergeant Prokop, one of the Northlake police officers, although on a prior occasion she identified defendant Monteleone as the main arrested by Sergeant Prokop.

One of the defense witnesses was Isabel Marino, wife of defendant Eugene Marino. Mrs. Marino testified that the garage behind her house was rented to a Mr. Anderson at the time of the events involved in the instant cause. A rent receipt book and income tax returns showing the reporting of such rental income were introduced into evidence. She further testified that Anderson used the garage for storage, not for a car. Mrs. Marino stored

374

her bleach and soap in the garage as well as garden tools and her children's bicycles. She had noticed boxes, that she claimed did not belong to her, stacked up in the garage. Her husband, she said, parked his car on the street and she denied that he ever removed any goods from the garage and placed them in his car.

In rebuttal, the State recalled Mrs. Nowak to the stand. A week prior to the events which gave rise to the arrest here, Mrs. Nowak saw Marino go into the garage. Another man drove his car up to the garage and then drove off, Marino following in his own car. This procedure had been repeated often during the first three months of 1964 and in 1963.

Chief Heggaton of the Northlake Police Department testified on the motion to suppress that he recognized Mrs. Nowak's voice when she called him on April 13, 1964, and informed him of the suspicious activities around the Marino garage. Heggaton and Sergeant Prokop had discussed the fact that stolen goods were being stored somewhere in the North end of Northlake. Prokop and Sergeant McLean, another Northlake police officer, were sent to investigate and Heggaton followed about ten minutes later. Upon arriving on the scene Heggaton saw the police car used by Sergeants Prokop and McLean and a large truck in Marino's driveway. The back of the truck was completely open and Heggaton identified a photograph showing boxes of pharmaceuticals stacked in the truck.

Sergeant Henry Prokop was called by defendant Monteleone to testify on the motion to suppress. Prokop related that he was dispatched by Chief Heggaton to investigate a "suspicious" situation at 208 N. Major Drive. Sergeants Prokop and McLean drove to the address in a squad car. They had no search warrant. Prokop also denied that Chief Heggaton had discussed with him the fact that stolen merchandise was being stored somewhere on the North end of Northlake.

375

Upon arriving at the scene, Prokop drove the squad car on to the driveway, stopping near the front of the house. At first he saw nothing suspicious but the truck was at the back of the driveway, about two feet away from the garage. A man peeked out from the rear of the truck and as the officers emerged from their car, three men started running.

The officers drew their weapons and McLean fired 2 or 3 shots in the air. The men ducked behind the house and were out of sight for an unspecified period of time. Prokop, however, did testify that everything that happened did so in very quick succession. Two figures leaped over the back fence and Prokop gave chase. About one block away he arrested defendant Pettit. Prokop did not remember if Pettit was standing still or running at the time he arrested him. He also claimed he did not know of any crime that had been committed.

During the course of the trial, Prokop was called as a Court's witness because his lawyer informed the State's attorney that Prokop's answers to certain questions would be different than the answers he gave before the Grand Jury. Although defendants objected at the trial to the Court calling Prokop as its own witness, this has been abandoned on appeal.

Under cross-examination by the State, Prokop testified that he was in plain clothes when he and Sergeant McLean went to Marino's house at 208 N. Major Street. As McLean drove into the driveway, Prokop saw a truck backed up against the garage. A head peered out from behind the truck and as the officers started to get out of their car some men started to run toward the back of Marino's yard. One man looked like he caught his clothes going over the side fence. Another man jumped over the back fence. Prokop followed him and finally caught up with him on Dickens Street, the first street North of Major Street. This man was later identified as defendant Pettit.

Although Prokop testified that he lost sight of the man as he went over the fence, he did say that the man captured looked like the same man who ran through Marino's backyard.

The State vigorously cross-examined Prokop on this point and confronted him with his testimony before the Grand Jury to the effect that Pettit was the man on the fence who ran when the officers arrived on the scene. Prokop had also testified at a prior hearing on a motion to suppress that he never lost sight of Pettit. Prokop also said he was not able to identify the man he saw go over the side fence. However, before the Grand Jury, Prokop testified that the man he saw go over the side fence was the same man later brought in to the Franklin Park Police Station and identified as defendant Rago.

After the arrest of Pettit, he was brought back to the squad car and handcuffed to Monteleone. Prokop testified that he could not remember any conversation that took place between the three men. At the Grand Jury, Prokop related that Monteleone offered him a bribe if he would let Pettit and Monteleone go.

At this point, the trial judge instructed the jury that this testimony related only to defendants Pettit and Monteleone. The jury was further instructed that prior inconsistent testimony by Sergeant Prokop was to be considered only for the purpose of determining the credibility of his testimony. The last question the State asked Prokop was:

> "Q. Sergeant Prokop, did you receive any money on this case from that bribe?
> "A. No, I did not."

On recross-examination by the State, the following question was asked:

> "Q. You said you were scared, scared of being indicted for perjury?

377

"A. I am not scared of being indicted for perjury for what I have testified here to because I am telling the truth."

The defense also cross-examined Prokop. He again denied being able to identify any of the defendants as being at the scene and denied that Pettit was the man he saw go over the back fence of Marino's yard.

The State also called Sergeant McLean to the stand. McLean testified that as he pulled into Marino's driveway, he saw the truck backed up against the garage. He saw men jump from the truck and start running. One of the men ran along the side of the garage. McLean gave chase but tripped, at which point he fired a shot from his service revolver. McLean got right up and jumped over the back fence. Defendant Monteleone was standing there with his hands raised and McLean took him into custody. McLean was not sure that Monteleone was the same man he saw running away from the truck and along the side of the garage.

A photograph of the truck showing the back completely open and boxes of pharmaceuticals stacked up inside was identified by McLean as the way it appeared at the scene. The garage door was open and McLean looked inside where boxes of pharmaceuticals were also stacked. After the situation was under control, McLean helped another officer load the remaining pharmaceuticals in the garage into a truck and drove the truck to the Northlake Police Station.

The other defendant involved in this appeal is Frank Rago. Lorretta Armentano was a neighbor of Marino. On the morning in question she was in her kitchen giving herself an insulin shot for her diabetic condition. Although the diabetes affects her eyesight in the mornings, she did see someone jump over the fence of her backyard, and in so doing tear his pants. This person stopped in her yard and looked one way, then the other. Because

Mrs. Armentano was not dressed, she went upstairs to get some clothes. She then called the police.

In the Armentano backyard was a toolshed. The doors to this shed were always left open. Officer Hermann of the Franklin Park Police responded to a call from the Northlake Police and drove to the school across from the Armentano residence. A man and woman flagged him down and led him to the Armentano backyard. The officer opened the doors to the toolshed and defendant Rago was sitting inside with his pants pulled down to his knees. The pants were ripped on the right leg. Rago told the officer he was just resting.

Officer Horan of the Northlake Police was called to guard the truck while it was at the station and to drive it to the Zahn Drug warehouse. He testified that he unloaded and inventoried the contents. Twenty-five cartons which were marked with the symbols "E–24" or "E–25" were segregated out and Horan brought them back to the Police Station.

An F. B. I. Agent, who was investigating the Zahn Drug case was notified by the Northlake Police of the find and went with Chief Heggaton to Marino's house. He saw the open truck and garage and looked at the cartons. The warehouse location markings were visible on several of the cartons in the garage. The agent also observed the unloading and inventorying of the boxes at the Zahn warehouse. The markings on the boxes were also seen at that time.

The defense introduced the testimony of Lieutenant Remkus of the Melrose Park Police and Detective Moran of the Sheriff's Police, both of whom testified that Robert Brown did not tell them about any markings on the boxes of pharmaceuticals stolen from Zahn Drug Company.

Defendant Monteleone produced as a witness on his behalf a friend named Thomas Grudecki. Grudecki lived about two blocks from Marino's house. On the date in

question, he was out looking for his dog when he saw Monteleone at the corner of Roy and Dickens talking with a man who had a star on his shirt. This is not inconsistent with officer McLean's testimony.

Each defendant moved to suppress the evidence taken from Marino's garage and the truck in his driveway. Defendants argue that there was insufficient probable cause upon which the officers could seize the merchandise. The call to the police only said something suspicious was going on. Furthermore they argue, even assuming that the persons who fled from the scene are these defendants, a fact they denied, the flight would not supply the requisite probable cause to justify the arrest and subsequent seizure of evidence.

■ A determination of what constitutes "probable cause" to permit an arrest and search must depend upon all the facts and circumstances in a given case. People v. McCrimmon, 37 Ill2d 40, 224 NE2d 822 (1967). We are fully aware that mere suspicion, common rumor or report, will not afford probable cause but it has been consistently held that probable cause means something less than evidence which would result in a conviction. People v. Jones, 31 Ill2d 42, 198 NE2d 821 (1964). As the Supreme Court pointed out in Brinegar v. U. S., 338 US 160 (1949):

> "In dealing with probable cause, however, as the very name implies we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (P 175.)

Put another way, if the circumstances are such that "a police officer could justifiably be disciplined for failure to act, his action can hardly be characterized as unreasonable." People v. Moore, 35 Ill2d 399, 403, 220 NE2d 443 (1966).

■ Reviewing the facts in the instant case, we have two police officers sent by the Chief of Police to investigate a complaint of suspicious activity around a neighborhood garage. Upon arrival at the scene they find a large truck in a residential driveway. Immediately upon the officers alighting from their police car, several men start running. The truck is completely open in the back and so is the garage door. Inside are stacks of cartons of pharmaceuticals. The Chief and an F. B. I. Agent arrive on the scene and the agent sees certain warehouse markings on the boxes which were similar to markings on the boxes stolen from the Zahn Drug Company. It seems to us that this fact situation gives rise to probable cause to permit a search of the premises.

Defendants rely on Henry v. U. S., 361 US 98 (1959) and Wong Sun v. U. S., 371 US 471 (1963) in support of their position that the search and seizure here was improper. In Henry, the defendants brought some cartons out of a residence to their car and drove off. Two officers investigating a theft from an interstate shipment of whiskey observed the defendants but were unable to see any name on the carton defendants were carrying. However, on "mere suspicion" they stopped these men, arrested them and seized the carton which later turned out to be stolen radios.

The instant case is clearly distinguishable from Henry. The Northlake Police were responding to a citizen's report. Upon arriving at the scene they encountered a situation which was more than merely suspicious. Their mere arrival caused men scurrying in all directions and in plain open view in a residential neighborhood was a large stock of over $50,000 worth of pharmaceuticals. The actions of the defendants here are not the innocent activities of carrying three cartons of radios to a car and driving off as in Henry.

Wong Sun is also distinguishable. In that case an arrest without a warrant was held to be improper

because there was no basis in experience for confidence in the reliability of the informant. Furthermore, there was no indication that the man arrested was the same person designated by the informant, nor was an accurate description of where he could be found given to the federal agents. Chief Heggaton testified here that he recognized Mrs. Nowak's voice when she telephoned and told him men were loading goods into a truck out of Marino's garage. We feel this makes the instant case much more definite as to activity and identity than the situation in Wong Sun and the action of the police officers here was proper. It is also to be noted that Wong Sun was a five-four decision and additional definitive facts here are sufficient to tip the balance to sustain the police action.

■ With regard to the cross-examination of Sergeant Prokop, defendants charge that the State went too far. We cannot agree. Sergeant Prokop's testimony was necessary to establish the connection between defendant Pettit and the crime. We do not feel the questioning by the State was out of bounds. Equally vigorous attacks on court witnesses were upheld in People v. Williams, 22 Ill2d 498, 177 NE2d 100 (1961), US cert Den 369 US 806 (1962), and People v. Jarrett, 57 Ill App2d 169, 206 NE2d 835 (1965).

■ ■ Defendants next argue that the State was guilty of prejudicial conduct in attempting to impeach its own witness, Sergeant McLean. As pointed out by both defendants and the State, such examination of a witness is largely in the discretion of the trial judge. People v. Wesley, 18 Ill2d 138, 163 NE2d 500 (1960). The State here pursued proper methods of impeachment. The court sustained each defense objection, denied the State's motion to have McLean made a court witness and instructed the jury to disregard improper comments. Although the abstract shows eight questions to which objections were sustained, whether the tempo and atmosphere of the trial

at this point was prejudicial to defendants was a determination for the trial judge. We find nothing here which would require reaching a different conclusion than reached at the trial.

■ During the closing argument, the prosecutor referred to Sergeants Prokop and McLean as the "I don't remember twins," referred to Chief Heggaton, who did not testify at the trial but was often mentioned, as "shifty" and accused these three policemen with being corrupt. All of these arguments are fair inferences from the evidence and were proper in closing argument. People v. Sinclair, 27 Ill2d 505, 190 NE2d 298 (1963). Characterizing certain testimony and witnesses as was done here does not appear to us to be prejudicial. People v. Johnson, 93 Ill App2d 184, 236 NE2d 388 (1968).

■ People v. Tyner, 30 Ill2d 101, 195 NE2d 675 (1964), cited by defendants is clearly inapplicable. In Tyner, the trial judge openly accused a State's witness of lying and withholding information. Such misconduct of a trial judge is not involved here. Nor, do we have a denunciation of the defendants' wickedness and indulging in invective unsupported by facts in evidence as was the case in People v. Fort, 14 Ill2d 491, 153 NE2d 26 (1958). Furthermore, the latitude allowed in castigating witnesses must of necessity be greater than when pointing at the defendant himself. The purpose of restricting closing argument is to prevent discussing matters which do not bear on the issue of defendant's guilt or innocence. This principle is not violated by calling a witness corrupt.

■ Another trial error alleged to have been committed by the State was asking Mrs. Nowak the following question with respect to each defendant:

> "Mrs. Nowak, can you say that the defendant was not one of the three men you saw with Marino in the backyard?"

383

Defendants argue that this question called for a highly speculative answer. We do not agree.

In their examination of Mrs. Nowak, defendants showed that she could not identify any of the men who were in the backyard. The impression the defense tried to advance was that because Mrs. Nowak could not identify them, defendants were not there. The State, on this peculiar identification issue, had the right to show that Mrs. Nowak was not testifying for the purpose of identifying the defendants. While this might have been done in different ways, the method chosen by the State was not in error.

 Defendants also argue that they were not proven guilty beyond a reasonable doubt. Granting that flight is circumstantial evidence of guilt, defendants assert that there is no other proof that these defendants performed the acts necessary to find them guilty of the charge in the indictment.

 Proof of crime may rest entirely on circumstantial evidence. People v. Smith, 90 Ill App2d 388, 234 NE2d 161 (1967); People v. Hill, 58 Ill App2d 191, 206 NE2d 269 (1965). It is unnecessary for us to review the evidence already detailed above. The facts show that each defendant here was engaged in loading a truck with boxes of drugs stolen from Zahn Drug Company. When the police arrived at the scene they ran and were apprehended at the farthest two blocks from the scene. We hold that the State did sustain its burden of proof and the finding of guilty was proper.

 Defendants' contention that the State failed to prove the fair cash value of the goods at the time of the theft is also not supported by the evidence. Robert Brown, the Zahn warehouse manager, testified that the drugs that were stolen during the weekend of October 5, 1963, had a shelf life of one year. He also testified that the cartons retrieved from Marino's garage on April 13, 1964, which bore his warehouse location markings,

had a fair market value of $3,000. This testimony was sufficient to establish value of the stolen property as required by the statute.

It is next argued that there is a variance between the proof and the indictment. The charge was that defendants "knowingly obtained and exerted unauthorized control over . . . property of Louis Zahn Drug Co." This is a violation of section 16–1(a). Defendants contend they should be indicted under section 16–1(d). Subparagraph (d) involves obtaining "control over stolen property."

As stated above, the facts show that defendants were caught moving cases of drugs, which had been stolen from the Louis Zahn Drug Company, from Marino's garage into a truck. This is clearly exerting control over property of another. There is no question but that the defendants were concealing the property and intended to deprive the owner of the use and benefit thereof.

Defendants further argue that even if Marino's possession of the drugs was unlawful, he was nevertheless an "owner" as that word is defined in section 15–2 of the Criminal Code. (Ill Rev Stats 1963, c 38 § 15–2.) Therefore, defendants assert, they can at best be charged with knowingly possessing stolen property (Section 16–1 (d)) and the evidence does not prove such knowledge. This point has been disposed of by this court in People v. Nunn, 63 Ill App2d 465, 212 NE2d 342 (1965). In Nunn defendant was charged with violation of section 16–1(a). There, as here, it was argued that it was not shown that defendant took the property from the true owner. In response the court stated:

"A good part of defendant's brief is devoted to arguing that the evidence does not show defendant to have taken the automobile from the place at which it had been parked by the owner. This contention misses the mark, however, because section 16–1(a)

385

(1) is not limited to the theft of the property in which only the actor who initiates the wrongful asportation is guilty of the offense. A person who 'knowingly obtains or exerts unauthorized control over property of the owner' is the statutory description of a thief, provided only that his act is accompanied by the requisite mental state. As expressly pointed out in section 15-8 the phrase 'obtains or exerts control' over property includes but is not limited to the taking or carrying away of the property. It also includes (though still not exclusively) the bringing about of a transfer of possession of the property. Ill Rev Stats (1963), c 38, §§ 15-7 and 15-8. The taking of unauthorized possession of the automobile in the instant case, therefore, need not have been on February 20, but could just as well have been on February 23 when defendant was caught in the garage by the police officers." (Pp 470-471.)

The only comment defendants make about the Nunn case is that the argument they raise was not raised in Nunn. From the opinion this does not appear to be true, nor is this adequate distinction in view of the general reasoning set forth in the Nunn decision.

 Whether the defendants had a fair trial is the next point raised. Under this general topic the defendants raise two arguments. First is the fact that a member of the jury was excused on Monday, May 17, 1965. The preceding weekend the headline in a newspaper read "BRIBE OFFER IN ZAHN TRIAL, Juror tells of call to S. Side Home." This referred to another trial concerning the Zahn Drug Company theft which was proceeding at the same time. Defendants claim the remaining jurors must have thought the released juror was involved in the bribery story reported in the paper. In our view, the failure to declare a mistrial at this point was not in error.

The trial judge asked the remaining jurors if they had read or heard anything about the case. The responses were negative. Secondly, the judge told the jurors that the juror was released for physical reasons pursuant to a memorandum from her physician. Thus, there is no reason to connect the bribery charge with any defendants or jurors in the instant case.

Neither People v. Kirkpatrick, 413 Ill 595, 110 NE2d 519 (1953), nor People v. Faulisi, 34 Ill2d 187, 215 NE2d 276 (1966) are applicable here. In both of these cases the jurors were drawn from the panel which had been used for the trial of a codefendant. Bias and prejudice was held to be inherent in such a situation. But here, the jury in the instant case had no connection with the jurors in the other "Zahn trial."

The second point raised is that defendants were prejudiced by newspaper publicity before and during the course of the trial. The defendants made seven motions for either a mistrial, a continuance or both. Their argument is twofold. First, they claim that there was prejudicial atmosphere surrounding the trial. At the time the prosecution against the instant defendants commenced trial in the cause of People v. Greenberg, involving a distinct aspect of the Zahn Drug Company theft and was in progress in another court room. Articles on the Greenberg trial were appearing daily.

On Friday, May 13, 1965, the selection of the jurors in the instant case was completed and the case adjourned to Monday morning for opening statements. Friday evening the headline about the bribe offer, set forth above, appeared in the papers. A later edition of the paper contained the following headline. "FOUND GUILTY IN ZAHN CASE." Over the weekend, several other articles although not headlines, appeared in the Saturday and Sunday papers.

We have already indicated that on Monday morning the trial judge questioned the jurors en masse if they had

read, heard, or discussed anything about the case over the weekend. The response was negative. The jury had been admonished on the preceding days against reading or discussing the case and this direction was repeated at the close of each session of the trial.

This court is fully aware of the ever present danger that the right of the individual to a fair and impartial trial is often infringed upon by mass communication media. Certain remedies were suggested by the Reardon Report, American Bar Association Project Minimum Standards for Criminal Justice, "Fair Trial and Free Press," Tentative Draft (1966). But each case must be evaluated on the circumstances peculiar to it. Sheppard v. Maxwell, 384 US 333 (1966).

In People v. Brinn, 32 Ill2d 232, 204 NE2d 724, (1965), we stated:

> "In the present case, where there is no evidence in the record that the jurors had read the headlines, and indeed a negative response by the jurors to specific inquiries as to their exposure to such influences, we do not believe that the trial judge erred in believing that the panel was free of prejudice and that the jurors had heeded the court's constant instructions and admonishments. (Cohen v. United States (9th cir) 297 F2d 760, 764.) We therefore conclude that the trial court did not err in denying defendants' motions for mistrial." (P 239.)

The above quote is clearly applicable to the instant case. The jury was admonished not to expose themselves to outside influences and when questioned about this they informed the court they complied with its instructions.

Although not cited by either party, People v. Cain, 36 Ill2d 589, 224 NE2d 786 (1967) is particularly relevant. Cain involves yet another aspect of the Zahn Drug Company theft. A series of headlines presented information

388

which was not proper for consideration by the jury. One of the jurors admitted seeing the headlines. It was at this point that the trial judge in Cain failed to exercise the options available to him to maintain the impartiality of the jury.

While the publicity in the instant case approaches the quantum of prejudicial comment surrounding Cain, it does not reach the same proportions. Furthermore, we have no indication of any improper influences on the jury for which corrective steps had to be taken.

United States v. Accardo, 298 F2d 133 (7th Cir 1962), is the basis of the defendants' second argument that they did not receive a fair trial. Defendants requested the trial judge to conduct an in camera individual examination of each juror. In Accardo the court reversed the conviction stating:

> "The jury separated each night and was exposed to the prejudicial publicity. In view of that fact and of defendant's publicity value, it was essential that the judge frequently, prior to separation call the attention of the jurors specifically to the possibility of newspaper accounts carrying statements of facts about the case. Coppedge v. United States, DC Cir, 272 F2d 504, 507 (1959).
>
> "The judge's general admonitions at the beginning of the jury selection, his assumption of their effectiveness, and his instructions, were inadequate protection. His general inquiry during the voir dire examination did not supply the deficiency. *There is no certainty that all jurors would volunteer information about violating the admonitions or admit that they were influenced by the publicity.* Coppedge v. United States, DC Cir, 272 F2d 504, 508 (1959). *He should have by the careful examination of each juror, out of the presence of the others, determined the effect of the articles on those who had read them*

389

*and whether they had discussed the articles with others.* Coppedge v. United States, DC Cir, 272 F2d 504, 508 (1959). *These individual interviews would have tended to overcome reluctance to speak out."* (P 136, emphasis added.)

 ██ The individual juror examination procedure called for by defendants and approved in Accardo is not binding in our State courts. In People v. Brinn, supra, a similar request was made and denied in a case where daily banner headlines relating to the trial appeared in the local Chicago newspapers. Our Supreme Court affirmed the conviction. A refusal to poll the jury was also affirmed in People v. Johnson, 35 Ill2d 516, 221 NE2d 497 (1966). Pursuant to the Illinois authorities, we find no error in the trial court's refusal to follow the procedure outlined in Accardo.

 The final point raised by defendants is that the trial court erred in refusing to conduct a hearing in aggravation and mitigation. Although counsel for defendants did address the court on their behalf, the record does not disclose that a full hearing was had. In People v. Sessions, 95 Ill App2d 17, 238 NE2d 94 (1968), this Division fully discussed the mandatory requirement of conducting a hearing in aggravation and mitigation. We therefore remand this cause to the Circuit Court of Cook County, Criminal Division, to conduct such a hearing.

Judgment affirmed and cause remanded with directions.

BURMAN, P. J. and MURPHY, J., concur.