(No. 41530.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* EUGENE MARINO *et al.*—(FRANK RAGO *et al.*, Appellants.)

*Opinion filed March 24, 1970.*

WARD, J., took no part.

FRANK G. WHALEN, of Chicago, for appellants.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and PATRICK T. DRISCOLL, JR., Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Defendants Eugene Marino, Frank Rago, John Monteleone, and Angelo Pettit were convicted of theft of property exceeding the value of $150 after a jury trial in the circuit court of Cook County and each was sentenced to a term of not less than one nor more than five years in the penitentiary. A co-defendant, Robert Vaughn, was acquitted. On appeal to the Appellate Court for the First District, the judgments of conviction as to defendants Rago, Monteleone, and Pettit were affirmed (95 Ill. App.2d 369), but the cause was remanded to the trial court with instructions to conduct a proper hearing on aggravation and mitigation. The appellate court, in a separate appeal, also affirmed the conviction of defendant Marino. (95 Ill. App. 2d 391.) We have allowed defendants Rago, Monteleone, and Pettit leave to appeal from the judgment of the appellate court. Defendant Marino is not a party to this appeal.

Prior to the commencement of the jury trial, the trial

court conducted a hearing on defendants' motion to suppress evidence. During the hearing, Sgt. Henry Prokop of the Northlake police department testified that at about 10:00 A.M. on April 13, 1964, he and Sgt. Ralph McLean were in the office of Paul Heggaton, the Northlake chief of police. Chief Heggaton received a phone call, after which he directed Prokop and McLean to travel to 208 Major Drive, the home of defendant Marino, as there was "something suspicious" going on there. On direct examination Sgt. Prokop testified that he had no knowledge that a crime had been committed or what type of crime they were investigating, as he and Sgt. McLean drove their squad car onto the Marino premises, or indeed when the arrests were made. However, on cross-examination by the assistant State's Attorney, it was brought out that Prokop had, prior to the incident in question, heard during the course of his police work from his fellow police officers that stolen property was being stored somewhere in the north end of Northlake, and that is where the Marino premises are located. In any event, Prokop and McLean took a squad car, unmarked except for police insignia on the sides thereof and two red flashers built into the headlights, and drove to 208 Major Drive. As they drove onto the premises, they observed a large truck in the driveway backed up to the front of a garage. After the squad car came to a halt in the driveway, Sgt. Prokop noticed a person peer around the rear of the truck. He drew his revolver, as did Sgt. McLean. Sgt. McLean fired two shots, as persons were running away from the scene. Prokop testified that he couldn't remember whether the fleeing subjects commenced their flight before or after the shots were fired by McLean. The officers gave chase, and Prokop apprehended and arrested defendant Pettit about a block from the Marino property. Pettit fitted the description of the person Sgt. Prokop had previously observed climbing over a fence at the rear of Marino's property. The police officers had no search warrant in connection with the premises in question.

Helen Nowak, who lives at 200 E. Major Drive in Northlake, which address is on the northeast corner of Major Drive and Roy Street, two doors east of Marino and on the same side of the street, testified at the hearing on the motion to suppress that at about 9:30 A.M. on April 13, 1964, she looked out of her window and saw a truck in the driveway of the Marino premises. Mrs. Nowak noticed four people in Marino's yard, about 65 feet away from her. She recognized Marino, who had keys in his hands. Marino opened the door to the garage and the men started to hurriedly load the truck with "cartons of something". Mrs. Nowak, after having called Chief Heggaton concerning her observations, went to her front window and observed the squad car come into the Marino driveway. As the squad car pulled up onto the driveway, the persons on the Marino premises started to run. Two of these persons jumped off the truck and ran to the rear of the premises, one to the right of the garage and the other to the left. The one who ran to the left of the garage jumped over the fence. Mrs. Nowak could not see where the other person who jumped off the truck went. Marino ran across his yard to the east side of his house. Mrs. Nowak saw the police run, heard them shout "halt" and observed them firing their guns into the air.

Sgt. McLean of the Northlake police department stated at the hearing on the motion to suppress that on the day in question he received an order from Chief Heggaton to go to 208 Major Drive with Prokop to investigate a "suspicious truck" in the driveway. At that time he was wearing a white shirt with a gold star thereon and light blue pants with dark blue stripes down the sides. He drove the squad car to the premises, observed the truck, and turned into the driveway and stopped. At that time he saw nothing suspicious. As he emerged from the squad car, he saw some subjects peer around the rear of the truck and jump therefrom. As he saw the subjects run, he drew his weapon and shot twice

into the air. He observed "four or five" figures running from the truck. He could not observe their facial features. He gave chase but lost sight of the fleeing figures temporarily. When he arrived behind the garage he observed defendant Monteleone standing there with his hands in the air, whereupon the latter was taken into custody. Sgt. McLean asked Monteleone what he had been doing by the truck and the latter indicated that he hadn't been there. Monteleone also stated, according to Sgt. McLean, that he was standing there with his hands in the air because a shot had "whizzed" by him. Monteleone fit the description of the person Sgt. McLean saw running to the rear of Marino's lot along the west side of the garage insofar as his dark clothes and his size were concerned. When Sgt. McLean returned to the garage and truck after taking Monteleone into custody, he observed cartons in the garage and in the truck, which items were subsequently seized.

Defendant Marino testified at the hearing on the motion to suppress that he had rented his garage to a Mr. Anderson in 1963 and that it was so rented on April 13, 1964. He nonetheless had not relinquished complete control over the garage in that he retained a key thereto and kept certain items therein. On April 12, 1964, he had received a telephone call inquiring about his house, which he said was for sale. This same person called again on April 13, 1964, at about 8:30 A.M. After the latter call, Marino went to sleep and the next thing he recalled was Monteleone and Pettit ringing his front door bell. The two men went into Marino's backyard, whereupon Marino went into his bedroom for a pair of shoes and stockings. He heard shooting and ran to his back door where he observed Sgt. McLean and Robert Vaughn. When he walked out of his house he was arrested. He did not give the officers permission to come onto his property, nor was he aware of the truck's presence on his premises when he came out of his house. Prior to that day, Marino had never seen defendants Monteleone or Pettit,

nor had he ever seen defendant Rago prior to their meeting at the police station after having been taken into custody.

Paul Heggaton testified at the hearing on the motion to suppress that on April 13, 1964, he was the acting chief of the Northlake police department. Prior to that time, he had received information from various sources that stolen merchandise was being kept on the north side of Northlake. At about 10:00 A.M. Chief Heggaton received a phone call from Mrs. Nowak, whose voice he recognized, having known her prior to that time for 12 years. Mrs. Nowak informed him that there were three or four men loading goods from a garage into a truck in a suspicious manner at 208 Major Drive. After his conversation with Mrs. Nowak, Chief Heggaton dispatched Sgts. Prokop and McLean to that address, informing Sgt. Prokop that "this may be what we are looking for". The chief testified that he had informed Prokop on numerous occasions prior to the incident in question that stolen merchandise was being kept in the north side of the city, but Prokop denied having been so informed. Chief Heggaton left for the Marino premises about 10 minutes after Sgts. Prokop and McLean had gone. When he got there, he observed a large truck and a squad car. He observed cartons in the truck.

At the trial of the cause, Robert G. Brown, the warehouse manager of the Louis Zahn Drug Company, testified that the company warehouse in Melrose Park was burglarized at some time between Saturday, October 5, 1963, and Monday, October 7, 1963. He identified the cartons discovered at Marino's property on April 13, 1964, as being part of the pharmaceutical merchandise taken from the warehouse. He further testified that in his opinion the fair cash market value of all the goods found in Marino's garage was about $50,000, and that the merchandise contained in 25 cartons found in Marino's garage which Brown had marked before they were taken from the warehouse had a value of $600.

Mrs. Nowak testified again during the trial. Her testimony was substantially the same as that given at the hearing on the motion to suppress, recounted earlier herein. On cross-examination, she stated that she could positively identify only Marino as being present at his garage, and on redirect she stated that she could not say definitely whether the defendants Monteleone, Pettit, and Rago were or were not the other men present at Marino's property. She identified defendant Rago at the trial as the man who was apprehended by Sgt. Prokop, although on a prior occasion she identified defendant Monteleone as the one arrested by Prokop.

Loreta Armentano testified at the trial that she resided at 241 E. Dewey in Northlake. At about 10:00 A.M. on April 13, 1964, she was in her kitchen taking insulin for a diabetic condition. Her kitchen faces a school yard in back of the Roy School, and is separated from the school premises by an 8-or-10-foot fence. The kitchen is about 190-200 feet from the fence. She happened to glance out her window and observed what she thought was a "teenager" running in the school yard. He scaled the fence, tearing his pants, and came onto the Armentano property, whereupon he hesitated and looked about. Mrs. Armentano called the police as to her observations. She could not identify the person she saw on her property. She stated that she has a tool shed on her premises, which shed is always kept open.

Police officer Joseph Hermann of the village of Franklin Park testified that he was patrolling the area around Mannheim and Grand in Franklin Park when at about 10:00 A.M. on April 13, 1964, he received a radio message broadcast by the Northlake police. About 15 minutes later he received another message, whereupon he proceeded in the direction of the Roy School. A man and a woman flagged him down and he followed them to the Armentano premises, where he had a conversation with a woman. He and his co-officer went to the tool shed, opened its door, and observed a man sitting

therein identified as defendant Rago. His pants were pulled down to his knees and were ripped. In response to a question of one of the officers, defendant Rago stated that he was resting in the shed.

Isabel Marino, defendant Marino's wife, testified on behalf of the defense that the garage behind the Marino home had been rented to a Mr. Anderson at the time of the incident in question. She stated that Mr. Anderson used the garage for storage purposes and not for a car. Rent receipts and income tax returns substantiating the rental income were introduced as evidence. Mrs. Marino also used the garage for storage, and she had upon occasion observed boxes not belonging to her stored in the garage. She stated that her husband parked his car on the street and denied that he ever removed articles from the garage and placed them in his car.

In rebuttal, the State recalled Mrs. Nowak, who testified that she had observed Marino on prior occasions go into his garage. Another man would drive his car up to the garage and then drive off with Marino following in his own automobile.

Sgt. Prokop was called as a court's witness during the trial, inasmuch as his attorney had advised the State that Sgt. Prokop's answers to certain questions would differ from those he gave to the grand jury. During the State's cross-examination, Sgt. Prokop testified that on April 13, 1964, he had gone to 208 Major Drive in Northlake in a squad car with Sgt. McLean. Sgt. Prokop was in plain clothes and Sgt. McLean was in uniform. Upon arriving at Marino's premises Sgt. Prokop noticed a truck backed up against the garage. He saw part of a man's head peer around the truck, and, at about the same time the officers were emerging from their car, he noticed people running to the east and to the back of the premises. He gave chase. He ran north through Marino's backyard, and as he was doing so, observed a person on the fence at the rear of the

premises. Sgt. Prokop went over the fence in pursuit. He lost sight of the fleeing person but caught up with him on Dickens Street, the first street north of Major Street. Prokop testified that the man he captured looked like the same person who had run through Marino's backyard. This person was identified as defendant Pettit. Immediately after Sgt. Prokop had scaled the rear fence, he observed a person he could not specifically identify going over a side fence to his left. It looked as if this person was caught on the fence. Defendant Rago fitted the description of this person.

The State further cross-examined Sgt. Prokop as to his account of the chase at the trial, and attempted to impeach his trial testimony with prior statements made before the grand jury, at a preliminary hearing, and during a conference with the assistant State's Attorney, where Sgt. Prokop had stated that defendant Pettit was on the fence in back of the Marino property, that he had not lost sight of Pettit at all, and that he recognized defendant Rago as the person hung up on the side fence. Sgt. Prokop further testified that after he arrested Pettit he took him back to the scene, placed him in the squad car, and handcuffed him to Monteleone. Sgt. Prokop could not remember having a conversation with Pettit and Monteleone at that time. However, he had told the grand jury that Monteleone had offered him a bribe at the time if he would let the defendants go. Sgt. Prokop denied having received any money in the case as a bribe. The trial judge at this juncture specifically admonished the jury that prior inconsistent statements of witnesses were to be used only for the purpose of determining the credibility of the witness so impeached, and not for the purpose of proving the assertions made therein. Although Sgt. Prokop stated at the trial that he couldn't remember making these prior inconsistent statements, the State and the defense subsequently stipulated that the court reporter's transcript of Sgt. Prokop's testimony at the preliminary hearing

and the grand jury was correct, whereupon the jury was advised that such statements were to be used only for determining the witness's credibility.

During the defense cross-examination of Sgt. Prokop, he denied that he could identify any of the defendants as being present at the Marino property prior to their arrest and further denied that Pettit was the man he observed going over the fence at the back of Marino's premises.

Sgt. McLean testified at the trial, on behalf of the State, that he chased the man who ran to the west side of Marino's garage. He fired a couple of shots during the chase. He tripped and fell while going by the garage but got up immediately, ran to the back fence, jumped over it, and arrested defendant Monteleone in the yard directly in back of Marino's property. Sgt. McLean couldn't be positive as to whether Monteleone was the man he saw running along the west side of the garage, but when he saw him clearly for the first time, Monteleone was standing with his hands in the air. After the defense cross-examination of Sgt. McLean, the State attempted on redirect to bring out apparently differing testimony which McLean had made before the grand jury. Defense objections to this redirect were consistently sustained by the trial judge.

Thomas Grudecki testified on behalf of defendant Monteleone that he observed the latter and a man with a star on his shirt talking at the corner of Roy and Dickens. Presumably this testimony was introduced in an attempt to rebut Sgt. McLean's testimony that he arrested Monteleone at the property immediately north of Marino's premises. In our judgment it does not accomplish such purpose and in fact is not necessarily inconsistent with McLean's trial testimony.

Defendant Vaughn, who was the owner of the truck, testified that he had been hired by two men to do some hauling but that none of the other defendants were such men;

and that, indeed, he had never seen the other defendants before.

Testimony of other witnesses is not relevant to the issues raised on this appeal and accordingly need not be recounted here. However, for an account of such testimony, reference may be made to the opinion of the appellate court. (95 Ill. App. 2d 369.) Defendants Rago, Monteleone and Pettit did not testify at the trial.

Defendants contend that the trial court erred in denying their motion to suppress the evidence obtained from Marino's premises, identified at the trial as pharmaceutical merchandise taken from the Louis Zahn Drug Company warehouse. Specifically, it is charged that the arresting officers Prokop and McLean did not have probable cause to arrest the defendants and seize the merchandise incident thereto. We disagree. An arrest may be made by a police officer without a warrant when he has reasonable grounds for believing that the person to be arrested has committed or is in the process of committing a crime. (*People* v. *Peak,* 29 Ill.2d 343, 347; *People* v. *DeMarios,* 401 Ill. 146, 149; Ill. Rev. Stat. 1963, ch. 38, par. 107—2(c).) Whether reasonable grounds exist depends upon the totality of the facts and circumstances of the arrest (*People* v. *McCrimmon,* 37 Ill.2d 40, 43), and such determination must be made upon practical considerations of everyday life upon which reasonable and prudent men must act. (*People* v. *Davis,* 34 Ill.2d 38.) While probable cause or reasonable grounds presupposes more than mere suspicion on the part of the arresting officer, an arrest may be made on something less than evidence which would result in conviction. Moreover, probable cause may be founded upon evidence not admissible at the trial of the charge in question. (*People* v. *McCrimmon,* 37 Ill.2d 40, 43.) Here, the chief of the Northlake police, who had prior knowledge that stolen property was being secreted somewhere in the north side

of the city, received a phone call from a person he had known for 12 years advising him that men were "hurriedly" loading goods into a truck from a garage in a residential area of the community, where such commerce is presumably not ordinarily transacted. After receiving this information, the chief dispatched two of his police officers, Sgts. Prokop and McLean, to the premises in question. The chief testified that he had on prior occasions discussed the storage of stolen merchandise in the area in question with Sgt. Prokop, and that he sent the latter along with Sgt. McLean, saying "this may be what we are looking for". Although Sgt. Prokop denied discussing the stolen property matter with the chief, the hearing judge apparently did not believe him and in any event this is of no real consequence. Sgts. Prokop and McLean drove a squad car onto the premises in question, whereupon they observed a person peering from behind a large truck which was backed up against a garage, and thereupon observed persons attempt to flee from the scene. Although Sgt. Prokop was in plain clothes, McLean was in uniform and a badge was displayed upon his shirt. Upon seeing the flight of the suspects, the officers gave chase. Sgt. McLean found defendant Monteleone with his hands in the air, and Prokop arrested defendant Pettit a block or two away. Pettit fitted the description of the suspect he observed fleeing over a fence in the immediate area. Sgt. Prokop, if Chief Heggaton is believed, had discussed with him the possibility that this was what the police were looking for, and Sgt. McLean apparently knew something of this although less than Prokop. Upon arriving at the scene in question, they observed persons in flight. Under these circumstances we hold that the officers manifestly had reasonable grounds to believe defendants were committing an offense and were thus warranted in making the arrests and the seizure incident thereto. (*People* v. *Bambulas,* 42 Ill.2d 419; *People* v. *McCracken,* 30 Ill.2d 425; *People* v. *Williams,* 368 Mich. 494, 118 N.W.2d 391, *cert.* denied 373 U.S. 909,

10 L. Ed. 2d 411, 83 S. Ct. 1297.) Defendants' reliance upon *Henry* v. *United States,* 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168, and *Wong Sun* v. *United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, is misplaced. In *Henry,* the accused was arrested and searched on mere suspicion, there being no showing that the defendant's actions prior to the arrest were other than outwardly innocent, whereas here the police had information that stolen property was being stored in the north side of Northlake, where Marino's premises were located, a complaint had been made by a private citizen, known by the chief of police, that men were "hurriedly" loading a large truck from a garage in a residential area, and, when officers arrived at the scene, persons fled from the immediate area. In *Wong Sun* there was no evidence that the informant's story was reliable and in any event the information elicited from him was quite vague. Here, the informant had been known by the chief of police for 12 years, she specifically directed the police to the Marino premises, and her suspicions were confirmed by the flight of persons generally fitting the description of the defendants upon the arrival of the police officers.

Defendants further maintain that there was a fatal variance between the indictment and the evidence adduced at the trial. The indictment charges in relevant part that "on April 13, 1964, Eugene Marino, Frank Rago, John Monteleone, Angelo Pettit and Robert Vaughn committed the offense of theft, in that they knowingly obtained and exerted unauthorized control over drugs of the value of more than one hundred fifty dollars, the property of the Louis Zahn Drug Co.,  *  *  *  intending to deprive said [company] permanently of the use and benefit of said property, in violation of Chapter 38, Section 16—1(a), of the Illinois Revised Statutes 1963."

Section 16—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1963, ch. 38, par. 16—1) provides in relevant part that: "A person commits theft when he knowingly: (a) Ob-

tains or exerts unauthorized control over property of the owner; or * * * (d) Obtains control over stolen property knowing the property to have been stolen by another, and (1) Intends to deprive the owner permanently of the use or benefit of the property."

Defendants argue that they should have been indicted, if at all, under section 16—1(d) and not under section 16—1(a), in that the proof indicates that the original asportation of the merchandise in question occurred on October 7, 1963, some six months before April 13, 1964, the date charged in the indictment as the occurrence of the offense. This circumstance does not render the indictment invalid, however. The conduct specifically proscribed in subsection (d), often termed "receiving stolen property", is not a separate offense in Illinois. It is included within subsection (a), which describes as an offender, "A person [who] knowingly: (a) Obtains or *exerts* unauthorized control over property of the owner." (Emphasis supplied.) Thus, as reasoned by the appellate court in *People* v. *Nunn,* 63 Ill. App. 2d 465, at 470, "section 16—1(a) is not limited to the theft of property in which only the actor who initiates the wrongful asportation is guilty of the offense." (See S.H.A. ch. 38, § 16—1, Committee Comments; *People* v. *McCormick,* 92 Ill. App. 2d 6, 11-13.) Here, the proof clearly shows that defendants were apprehended immediately after exerting unauthorized control over property of the Louis Zahn Drug Company. That they intended to deprive the company permanently of the use and benefits of the property may be inferred from their actions in connection therewith.

Defendants say nonetheless that in this case defendant Marino was the "owner" of the property even though such ownership was "unlawful" and there is no showing that they exercised unauthorized control over it as to him. This argument is wholly without merit, as "owner" is defined in the Criminal Code as "a person, other than the offender, who has possession of *or any other interest* in the property

involved, even though such interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property." Ill. Rev. Stat. 1963, ch. 38, par. 15—2. (Emphasis supplied.)

The fact that Marino would qualify as an "owner" for the purposes of the Code does not establish him as the exclusive owner. The statutory definition includes as "owner" both Marino and the Louis Zahn Drug Company. The defendants were clearly charged with the theft of property of the Louis Zahn Drug Company, and that charge is not affected by the fact that under different circumstances they could have been charged with theft of the property from Marino. The indictment was therefore adequate and proper, and not at variance with the evidence adduced at the trial.

It is further argued by defendants that the State's cross-examination of the court's witness Sgt. Prokop was improper and so prejudicial as to warrant reversal of the convictions and remandment for a new trial. As related earlier herein, this witness was made a court's witness pursuant to the State's request because it became apparent that his testimony at the trial would differ materially from statements he made earlier before the grand jury, at a preliminary hearing, and to the assistant State's Attorney. These prior inconsistent statements were brought forth in bold relief during the State's cross-examination of Sgt. Prokop. Defendants, relying principally on *People* v. *McKee,* 39 Ill.2d 265, suggest that such matters were not introduced principally for impeachment purposes but rather as incompetent evidence of guilt. In *McKee* we reversed the defendant's conviction where the trial court, sitting without a jury, clearly employed impeaching hearsay statements of an alleged accomplice of the defendant who had been made a court's witness as substantive evidence of defendant's guilt. Unlike the situation in the present case, the statements used under the guise of impeachment were in part admissions of guilt made by the witness out of the presence of the defend-

ant implicating the latter in the crime. (See *People* v. *Tunstall*, 17 Ill.2d 160.) Further, the trial court had there allowed the State to vigorously and minutely cross-examine the witness on matters purely collateral to the issues in the case. Here the trial court specifically admonished the jury during the State's cross-examination of Sgt. Prokop that prior inconsistent statements made by such witness were to be used only for the purpose of determining his credibility and not as proof of the assertions therein made. In addition, the impeaching statements were largely germane to the issues in the case. Defendants do not question the propriety of the trial court's decision in making Sgt. Prokop its own witness; the State needed his testimony in order to establish defendant Pettit's participation in the crime, and under the circumstances present at the trial, we do not believe that the State's cross-examination of Prokop constitutes reversible error. See *People* v. *Rotello*, 339 Ill. 448; *United States* v. *Browne*, (2d cir., 1963), 313 F.2d 197,) annotation appearing in 65 A.L.R. 538 at pp. 553-555.

Defendants claim error as a result of the State's attempts to impeach the testimony of its own witness, Sgt. McLean, when on redirect examination inquiry was made into prior statements allegedly made by him which apparently differed from his testimony on cross-examination by the defense. We note that the court sustained all of defendant's objections to this line of questioning, but, more importantly, it would not have been error if the trial judge had allowed the State to pursue the matter. As we observed in *People* v. *Wesley*, 18 Ill.2d 138, 151, "where the witness unexpectedly gives testimony against the party calling him, such party has the right of examination to show that the witness gave surprise testimony and to specifically call his attention to former inconsistent statements made by him for the purpose of refreshing his memory or awakening his conscience to the end that he may relent and speak the truth if he is lying." Defendants' contention in connection with Sgt. Mc-

Lean's redirect examination is without merit. See also *People* v. *Quevreaux*, 407 Ill. 176; *People* v. *Rongetti*, 344 Ill. 278.

Defendants next claim that they were prejudiced by newspaper publicity before and during the trial and that the trial judge abused his discretion in denying a continuance and mistrial as to each of the defendants. We have carefully examined all of the allegedly prejudicial news articles set forth in the record and we think that they constitute fair news reporting and do not exceed the bounds of propriety. In any event, however, the trial court repeatedly warned the jurors not to read or listen to anything about the case. Furthermore, during the trial each juror responded in the negative to the court's inquiries as to whether any had read or heard anything about the case. Defendants claim that reversal is required by virtue of the trial judge's failure to admonish the prospective jurors prior to the *voir dire*. In this connection we note that there is absolutely no showing that defendants had exhausted their peremptory challenges by the time the selection of the jury was completed, and as we observed in *People* v. *Brinn*, 32 Ill.2d 232, at 236: "The fact that defendants did not challenge any of the jurors selected is strong evidence that they were convinced that the jurors were impartial and unbiased." As for the defendants' repeated requests for a continuance, we cannot say that the trial judge erred in denying them. Granting a continuance based upon publicity attendant to a trial is a matter largely committed to the sound discretion of the trial court. We see no abuse of that discretion here. (*People* v. *Kurtz*, 37 Ill.2d 103, 108; *People* v. *Wilson*, 29 Ill.2d 82, 90.) There is absolutely no showing in the record before us that the newspaper articles referred to by the defendants affected them prejudicially during the trial. It should be noted that they did not ask to have the jury sequestered, which might have been appropriate under the circumstances. (*Brinn*, at 237.) Defendants claim that the trial judge

should have conducted individual *in camera* inquiries of each juror about the effect, if any, of the newspaper articles, relying on *United States* v. *Accardo* (7th cir., 1962), 298 F.2d 133, where the circuit court of appeals required that procedure to be followed. In *Accardo,* however, the jurors had been admonished only against reading or listening to the media about the case during the jury selection and at the end of a nine-week trial. Here, the trial judge frequently cautioned the jurors about these matters during the trial. In any event, however, *Accardo* is not binding on this court, and we cannot say that the procedure there mandated was required in this case. See *People* v. *Brinn,* 32 Ill.2d 232, 238; *People* v. *Johnson,* 35 Ill.2d 516, 520.

We now reach defendants' argument that the State did not prove its case against them beyond a reasonable doubt. In this connection, it is well settled that the commission of an offense may be established entirely by circumstantial evidence. As we observed in *People* v. *Bernette,* 30 Ill.2d 359, 367, "a conviction may be sustained upon circumstantial evidence as well as direct evidence, (*People* v. *Russell,* 17 Ill.2d 328,) it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People* v. *Magnafichi,* 9 Ill.2d 169; *People* v. *Grizzel,* 382 Ill. 11.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt." In the present case the evidence, heretofore recounted at length, shows that persons were hurriedly loading a large truck in a residential area with merchandise theretofore stolen from the Louis Zahn Drug Company, that when police arrived, persons fitting the description of defendants attempted to flee from the scene, and that, further, defend-

ants were apprehended near the premises in question. Thus, defendant Pettit fitted the description of the man Sgt. Prokop observed scaling Marino's fence. That Pettit was in fact such person is further corroborated by Prokop's admonition "Stop, or else I'll drop you" made immediately prior to the arrest. Defendant Rago matched the description of the person observed scaling a fence adjacent to the Marino premises. A person was seen by Mrs. Armentano climbing the fence between her property and the school yard. She thought that in such process he tore his pants. Defendant Rago was found hiding in her tool shed by Officer Hermann. His pants were ripped, and he stated he was "resting". Defendant Monteleone was arrested in the yard immediately north of Marino's backyard. Prior to the time he was apprehended, indeed, when Sgt. McLean first saw him immediately prior to the arrest, he had his hands in the air. While it is true that there was no direct evidence that defendants knew that the property in Marino's garage which was being loaded into the truck belonged to the Louis Zahn Drug Company, the circumstantial evidence of the hurried loading and the flight when the police officers arrived at the scene clearly establishes that defendants knew that such property was not lawfully theirs. We hold that the State proved beyond a reasonable doubt that defendants herein committed the offense of theft.

Other contentions raised by defendants have been amply and correctly treated in the opinion of the appellate court and it would serve no useful purpose to again discuss such matters here.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.