THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GERALD L. HOLSAPPLE, Defendant-Appellant.

(No. 72-219;

Fifth District—August 7, 1975.

Robert E. Farrell and Richard E. Cunningham, both of State Appellate Defender's Office, of Mt. Vernon, and Edward S. Dougherty, of St. Louis University School of Law, for appellant.

Ronald A. Niemann, State's Attorney, of Salem, for the People.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

The defendant, Gerald Holsapple, was found guilty of the murder of Pat Armstrong by a jury in the circuit court of Jefferson County. His post-trial motion was denied by the trial court which sentenced him to the Illinois State Penitentiary for a minimum of 40 years and a maximum of 60 years.

Defendant contends that his conviction should be reversed because the State failed to prove him guilty beyond a reasonable doubt.

■■ The evidence in this case was wholly circumstantial. To support a conviction based on circumstantial evidence, it is essential that the facts proved be not only consistent with the defendant's guilt, but that they must be inconsistent with any reasonable hypothesis of innocence. (*People v. Lewellen*, 43 Ill.2d 74, 250 N.E.2d 651; *People v. Branion*, 47 Ill.2d 70, 265 N.E.2d 1.) But the defendant's guilt need not be proved beyond any possibility of a doubt even when the State relies entirely on circumstantial evidence. (*People v. Branion; People v. Murdock*, 48 Ill.2d 362, 270 N.E.2d 21.) The supreme court stated in *People v. Marino*, 44 Ill.2d 562, 256 N.E.2d 770, that a conviction may be based on circumstantial evidence, "it being necessary only that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." (44 Ill.2d 562, 580.)

The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient that all evidence taken together satisfies the jury beyond a reasonable doubt of the accused's guilt. (*People v. Marino.*) While a conviction based solely upon circumstantial evidence cannot stand if the proof supports any reasonable theory of the defendant's innocence, the jury is not required to search for a series of possible explanations compatible with innocence to elevate them to the status of a reasonable doubt. (*People v. Huff*, 29 Ill.2d 315, 194 N.E.2d 230.) Since the controlling feature of this case is whether the evidence is sufficient to show the guilt of the defendant beyond a reasonable doubt, a critical analysis of the testimony is necessary.

Pat Armstrong, who was approximately 60 years of age at the time of her death, lived in a small three-room house about 15 feet to the rear of another house in Sandoval, Illinois. Both houses were owned by Kenneth and Zelma Day who occupied the front house. On August 28, 1971, at about 5 p.m., the badly beaten and naked body of Pat Armstrong was found by Zelma Day in a bed in the Armstrong residence.

Mrs. Armstrong had been keeping company for some time with a 62-year-old man named Sheldon Apple, whose wife had been dead for a couple of years. It was their custom to have dinner together in the Armstrong home and he would usually come by her house on his way to work about 5:15 each morning to have breakfast with her. He had bought her a clock radio about a month before her death. He had dinner with her on the evening of August 26, 1971, and then went home. At 8 o'clock that evening, Mrs. Armstrong went to a tavern in Sandoval, being transported there by Kenneth Day who testified that she hired him to take her there. Later that evening Pat Armstrong was seen in another tavern, Fat's Tavern, which was situated about five blocks from Pat Armstrong's residence. While there, the defendant, Gerald Holsapple, was introduced to Pat Armstrong by a mutual friend, Henry Martin, who testified that the defendant asked him privately if Pat Armstrong was "putting out." He said he did not know. Both defendant and Pat Armstrong had several drinks together. Martin left Fat's Tavern at 12:10 a.m. and asked Pat Armstrong if she was ready to go home. She told him that she was going home with Holsapple because they were going to drink some beer that she had in the icebox. She then invited Martin and his then fiancee to go along, but Martin refused. Holsapple told Martin he was going to walk Pat Armstrong home. Martin testified that in his opinion, both Holsapple and Armstrong were drunk at the time he left the bar. His testimony was corroborated by his wife who was his fiancee on the evening in question.

William Wilkerson, a porter at Fat's tavern, testified that he saw Pat

Armstrong and Jerry Holsapple at the bar and that they both "had plenty to drink." They left the tavern together, heading east, at about 12:15 a.m. Holsapple was wearing dark trousers and a blue or black shirt. He testified that Pat Armstrong had a reputation for "going out with men."

Mrs. Jesse Peoples, the bartender at Fat's Tavern, testified that she served Jerry Holsapple and Pat Armstrong drinks during the evening of the 26th. She gave a last call for drinks about 10 minutes to 12 and Holsapple asked her for a drink after that but she refused him. She said she thought she sold him a package of Pall Mall cigarettes during that evening. She saw Holsapple and Pat Armstrong leave Fat's Tavern together shortly after 12 midnight and both had been drinking heavily. Mrs. Peoples testified that when she left to go home, she saw Pat Armstrong and Jerry Holsapple in the parking lot and Pat Armstrong was getting up from the ground at that time.

Zelma Day, who with her husband, Kenneth, owned and occupied the house in front of Pat Armstrong's house, testified that on the morning of August 27, 1971, at 2:25 a.m., she was awakened by Pat Armstrong's loud talking. She looked through her window and saw Pat Armstrong, who appeared to be under the influence of alcohol, standing partly inside her screen door talking loudly and gesturing with her hands. She then came over to the Day home, pounded on the door and called for Mrs. Day. She appeared to be intoxicated at the time. She told Mrs. Day that a man was out there fighting her and would not leave. She asked Mrs. Day to call the police, but before Mrs. Day could do so, Mrs. Armstrong returned and said the man had gone.

Sheldon Apple testified that at about 5 o'clock on the morning of August 27, he went into the Armstrong residence to have breakfast with Mrs. Armstrong, as was his custom. He said that she usually slept on a couch in the living room, but when he did not see her there, he put a bag containing a coffee cake that he had brought on the kitchen table and left the house. He said he did not see anything disturbed or out of the way in the house. The radio was not playing while he was there.

At about 5 on the evening of August 28, 1971, Mrs. Day discovered the body of Mrs. Armstrong in Mrs. Armstrong's home. The local police were called and they picked up the defendant Holsapple for questioning. Holsapple readily gave them full access to his room and to the clothing that he had been wearing.

The knuckles on both of Holsapple's hands were skinned and he had a deep gash between the middle and third fingers of his right hand. A knife which the State contends was Holsapple's was found in the Armstrong residence. There was no blood on the blade nor prints and it was not contended that the knife was used in the murder. Blood samples

were taken from Holsapple which matched the blood of someone who had been smoking cigarettes in the Armstrong home. This was ascertained by testing cigarette butts found in an ashtray. However, Kenneth Day testified that Mrs. Armstrong emptied her ashtrays only about once a month.

Hair was found on the outer shirt worn by Holsapple which *could* have come from the head of Mrs. Armstrong. However, the testimony indicated that this could have occurred from any kind of social contact. There was also dog hair on his clothing which did not come from Mrs. Armstrong's dog. No fingerprints of Holsapple were found in the Armstrong house; however, fingerprints of Sheldon Apple were found on an empty beer can and a glass on the kitchen table. Mrs. Armstrong's hair and another person's hair were found on a dress and a pair of torn underpants of Mrs. Armstrong which were found lying on the floor next to the bed where she was found lifeless. The other hair did not match that of the defendant. Although the State's evidence tended to prove that no one had been in the Armstrong house from 5 a.m. on August 27 until 5 p.m. on August 28, when Mrs. Armstrong's body was discovered, there was no evidence that her little dog which would have had to be in the house between those times, either defecated or urinated in the house.

The Chief of Police of Sandoval, Howard Weems, testified that on August 28, 1971, he received a call from Mrs. Zelma Day at approximately 5 p.m., and proceeded to Pat Armstrong's home. He met Kenneth Day in front of the house and when they entered the house they found Pat Armstrong's body on the bed in the bedroom. He did not detect any odor in the house and he did not see any place where Pat Armstrong's dog might have defecated or urinated in the house.

Kenneth Day testified that on a Saturday in August, 1971, at about 5 p.m., his wife told him that someone had been hurt or killed in the cabin behind their house. He said that the front of the cabin was about 15 feet from the rear of his house. On the evening in question, only the screen door of the cabin was closed and this was the only entrance to the house. He did not hear the radio playing and did not recall seeing the dog inside or outside the house. He did not notice any unusual odor in the house.

After the body was removed and the investigation was completed, Mr. Day boarded up the door to the cabin. A few days later, he went into the cabin to clean up and to burn the bed and the clothing. He observed that there were a couple of beer cans on the kitchen table, the same as there were on the night the body was found. He did not find evidence that the dog had dirtied the house. The mattress was soaked with blood and there was blood scattered all over the bedroom.

Day said that he did not usually pay much attention to Mrs. Armstrong's activities. It was possible that people might go in and out of her house and he would not notice it. She had lived in the house for 2 or 3 years and had occasional visitors. He identified Sheldon Apple as a good friend of Mrs. Armstrong, who would bring rolls and have breakfast with Mrs. Armstrong. He said that sometimes he would not see Mrs. Armstrong for a period of days, so it was possible that she could have come and gone from her house on Friday or Saturday.

Mrs. Zelma Day testified that on Saturday, August 28, 1971, at about 5 p.m., she was in back of her house when she heard Mrs. Armstrong's dog whining. She called to Mrs. Armstrong but when there was no response she opened the cabin door, let the dog outside and put it on a chain. She heard the radio playing, although it was not on a station, so she called out again and decided to enter the house to turn off the radio. Upon entering the house, she discovered Mrs. Armstrong's body. Mrs. Day did not turn the radio off. She ran outside and told her husband what she had found.

Mrs. Day testified that on Thursday, August 26, 1971, she saw Pat Armstrong and Sheldon Apple in the yard. Mrs. Day had company that evening and they were all out in the yard looking for Mrs. Armstrong's dog which had gotten loose. She assumed that Mr. Apple had had dinner with Mrs. Armstrong that evening because that was their custom.

Mrs. Day said that early Friday morning, at approximately 2:25 a.m., she heard Pat Armstrong talking very loud. She saw Mrs. Armstrong standing just inside her screen door, talking and gesturing with her hands. She appeared to be under the influence of alcohol. Mrs. Armstrong came over to the Days' house and began pounding on the door and calling for Mrs. Day. When Mrs. Day went to the door "Pat" asked her to call the police because a man from southern Illinois was fighting with her and would not leave. Before Mrs. Day could make the call, Mrs. Armstrong asked her to wait to see if the man had gone. Mrs. Armstrong returned after about a minute and said that the man left on foot. The police were never called.

Mrs. Day testified that Mrs. Armstrong had asked her to get the police on previous occasions when she wanted someone to leave her house. She said that when "Pat" was intoxicated, she would sometimes come to the Days' house in the middle of the night. On the morning in question, Mrs. Day never saw or heard anyone other than Pat Armstrong.

Mrs. Day further testified that she got up around 9 a.m. on Friday, August 27, 1971. She did her laundry and hung the clothes on the line outside her back door around noon. The door to Mrs. Armstrong's house was open at that time. She did not see or hear the dog, nor did she hear

the radio playing during the day on Friday. She said that on Friday night, sometime after she went to bed between 11 p.m. and midnight, Pat Armstrong's dog was whining, a light was on in her house, and her radio was playing music. When Mrs. Day heard the radio on Saturday, it was humming and not playing music.

Mrs. Day testified that there were times when she and Mrs. Armstrong would not see each other for several days. She said that she was aware that Pat Armstrong sometimes had men visitors. For some time Sheldon Apple had a routine of bringing rolls in the morning and having breakfast with Pat Armstrong if her light was on. Mrs. Day had not seen Mr. Apple on some of these occasions, but she stated that she did not see Mr. Apple on either that Friday or Saturday morning. She testified that Pat Armstrong cleaned house for Mr. Apple, who lived in Shattuc, Illinois.

Ray Swartzlander, a deputy sheriff of Marion County testified that on August 28, 1971, shortly after 5 p.m. he went to Pat Armstrong's house in response to a call from Chief Weems. The radio was playing, the living room window was open and Mrs. Armstrong's dog was chained outside. There was no unusual odor in the house and no sign that the dog had defecated or urinated in the house. He identified a photo depicting the condition of the Armstrong living room as the way he found it. He testified that the kitchen table was visible in this photo and that ash trays, a pocket knife, a pack of Pall Mall and a pack of Kool cigarettes were visible on the table. He examined the pocket knife and noticed that the blade had been filed down and that the handle was loose. The knife was left in the house after the investigation and Mr. and Mrs. Day had had custody of the knife until approximately 1 week before the trial. The pocket knife was introduced over objection.

Dr. Gregoro Sierra, a pathologist, testified that he performed an autopsy on the body of Pat Armstrong on Sunday morning, August 29, 1971. He listed strangulation as the primary cause of death and said that the serious trauma to the ribs, the head, and the chest were contributory causes. Dr. Sierra opined that bruises found on the deceased's body were caused by a solid, blunt object. He also stated that there was a laceration to the wall of the vagina with no hemorrhage. This wound was inflicted after death and was caused by the insertion of a hard object like a pipe or stick. From his diagnosis Dr. Sierra estimated that Pat Armstrong had been dead approximately 48 hours at the time of the autopsy on Sunday morning, give or take 16 hours from that time period. He was positive that death had occurred more than 24 hours from the time of the autopsy.

R. L. Austin, a crime-scene technician with the Illinois State Bureau of Identification, testified that on August 28, 1971, he went to the Armstrong house at 7 p.m. at the request of Sheriff Sanders. He said that he

was able to lift three fingerprints from the Armstrong house which were identifiable. One print taken from a beer can was identified as Pat Armstrong's, one found on a yellow glass on the kitchen table was shown to be that of Sheldon Apple, and the third print found on an orange glass on the kitchen table was also identified as Sheldon Apple's print. He examined the pocket knife and did not find any traces of blood or fingerprints. He found no indication that anyone had tried to remove fingerprints from any item in the house. None of the blood samples or fingerprints taken from the house were linked to the defendant.

Tom Hughes, a crime-lab analyst for the State of Illinois, testified that his major duties were analyzing blood and other body fluids. He identified a blue shirt which he had examined for hair and blood traces. He tested the stains on the shirt and determined that they were not seminal or blood stains. He removed hairs from the shirt and compared them to the decedent's hair. He opined that some of the hairs found on the defendant's shirt could have come from the head of Pat Armstrong. He said that it was not unreasonable to expect hair transference from one person to another in a typical social setting. He identified the cigarette butts which had been taken from defendant Holsapple's house and had been decomposed during analysis. There were three cigarette butts taken from the Armstrong house which had been analyzed. He explained that the cigarettes were examined to see if the saliva on them could be grouped as to type. He testified that one of the cigarettes taken from Jerry Holsapple's house was smoked by a secretor who had type B blood. Two cigarettes taken from Pat Armstrong's kitchen ashtray were smoked by a type B blood secretor. (It is interesting to note that although defendant had type B blood and therefore could have smoked the two cigarettes, the butts of which were in the ash tray on the kitchen table, his fingerprints were not found on the beer cans on the table, but Apple's were.) A cigarette butt found in an ashtray in the living room of the Armstrong house where defendant's knife was found was also tested. Hughes was unable to group the saliva taken from this cigarette. Hughes stated that 40% of the general population has type A blood and that 10% of the general population has type B blood. He testified that he tested the defendant's blood sample and found that he had type B blood. He also tested the decedent's blood and found that to be type A.

He tested a pair of white underpants for blood and seminal fluid stains and also for the presence of hair. No seminal fluid stains were found, but type A blood stains were found. He compared hairs he found on the underpants with the defendant's hair and found that it was dissimilar. He also found that some of the hairs on the underpants were dissimilar to Pat Armstrong's hair. Hughes also examined a green dress

taken from the bedroom floor and found that there was evidence of type A blood and no evidence of seminal staining on the dress. He compared some hair found on the dress, which was dissimilar to Pat Armstrong's hair, with that of the defendant and found that it was not similar to the defendant's hair.

Sheldon Apple testified that he resided in Shattuc, Illinois, and had been a widower for 2 years. He had been a friend of Pat Armstrong for over a year. He said that he visited Pat Armstrong at her house and she would prepare meals, usually supper, for him. He sometimes would bring doughnuts and stop by for coffee in the morning at about 5:15 a.m. He said that Pat Armstrong was the only woman with whom he had a friendship of this nature.

Apple testified that on the Thursday before Mrs. Armstrong was murdered, he arrived at her house at 4:30 p.m. and they ate a meal at 5 or 5:30 p.m. They also drank some beer. He could not recall if they had gone outside after the meal. He said that he left at 6 p.m. and went to his home about 4 miles away. Before he left, Mrs. Armstrong asked him to bring coffee cake in the morning so they could have breakfast together. He said that when he arrived at her house the following morning, Friday, at 5:15 a.m., he called for "Pat" one time and when she did not respond, he went into her house and left a coffee cake on the kitchen table. He did not look around the house when he went in. He said that Mrs. Armstrong's dog was on the couch in the living room where Mrs. Armstrong always slept; to his knowledge, she never slept in her bedroom. The house appeared to be in the same condition on Friday morning as it had been on Thursday night. The radio which he had bought her was not playing on Friday morning. Apple did not see the pocket knife or any other knife. He said it was not unusual for Mrs. Armstrong to be out of her house at 5:15 a.m., because she sometimes took walks early in the morning. He described Mrs. Armstrong as a medium drinker and said he had never seen her intoxicated. He said he had been to Fat's Tavern before, but was never there with Mrs. Armstrong.

He testified that Mrs. Armstrong cleaned his house in Shattuc every Saturday for about the last 10 months of her life. It was his custom to pick her up on Saturday at 12:30 p.m. and drive her to and from his house. He paid her for the work. Apple stated that he did not pick Mrs. Armstrong up on the Saturday her body was discovered because she had cleaned his house the previous Tuesday. He said that even though she had cleaned the house the Saturday before, he allowed her to come back on Tuesday when she asked if she could. This was the only time that Mrs. Armstrong had ever asked to switch her cleaning days, but she gave Mr. Apple no reason for so doing.

Apple testified that he worked until noon on Saturdays. On the Saturday that Mrs. Armstrong's body was discovered, he stopped at Sherman's Store in Sandoval on the way home from work and was told there that his girlfriend, Pat Armstrong, had been killed. He said he then proceeded to Shattuc and arrived home at about 1:30 p.m.

On redirect examination, Mr. Apple was asked if he would change his answer as to when he learned of Pat Armstrong's death if he knew that her body was not discovered until 5 p.m. Saturday evening. He replied that a man named George Anderson had told him of the death in the store on Saturday. He then said that he did not have the least idea of the time and that the time may have been 4 p.m. or later. He later stated that he did not think it was as late as 6 p.m. He also stated that he was not in the store right after work and that he probably arrived at home around 4:30 p.m. A Mrs. Lammers also spoke to Apple in Sherman's Market which was located three blocks from Pat Armstrong's house.

Sheriff Charles Sanders testified that Deputies Swartzlander and Walker picked up the defendant, Jerry Holsapple, and brought him to the scene for questioning. He was questioned in an automobile by Sheriff Sanders, Captain Simon Franklin, and Deputy Swartzlander. The sheriff said he noticed that the defendant had a deep cut between the middle finger and the ring finger of his right hand which was bandaged and the hand was also skinned in various places. He testified that Holsapple told his questioners that he had been in Fat's Tavern when an older woman approached him, called him by name, and asked if he would walk her part of the way home. He told Sanders that they left the tavern about 11:30 p.m. and proceeded down the highway to a school, where Mrs. Armstrong asked Holsapple to wait. She left him for a while and then returned with a couple of cans of beer. The defendant said he took a couple of sips of beer and then they departed, Mrs. Armstrong going back in a southerly direction and the defendant going to his cabin at the D & M Motel. The defendant said that when he got to the motel, he decided to get something to eat. He was proceeding to Miller's Truck Stop when some men jumped him and he had a fight. The men fled after the fight and the defendant returned to the motel around 1:30 a.m., where he remained the rest of the night.

Sanders testified that the police had received no report of the fight from anyone else. He stated that Mr. Holsapple gave a description of his attackers. Sheriff Sanders said that after the interrogation he had spoken to the defendant on a number of occasions and that the defendant remained cooperative and the substance of his story had remained the same. The defendant gave them permission to search his residence, saying that he had nothing to hide. The motel where he lived had permanent,

apartment-type dwellings. After the defendant was taken into custody, Sanders had his deputies pick up Sheldon Apple and he questioned Apple behind the Armstrong home.

The sheriff said that he had been in the bedroom several times during the evening of the investigation and had observed a gray dress which appeared to have been pulled off Mrs. Armstrong. He also observed the package of rolls which had been left on the kitchen table by Mr. Apple. Mrs. Armstrong's dog was chained outside the house, there was no peculiar odor in the house, and the radio was playing. His men thoroughly searched the area but found no murder weapon.

Shirley Austin testified that she lived at the intersection of Routes 50 and 51, next to the D & M Motel. In the early morning hours of August 27, 1971, her 3-year-old son woke her up wanting something to drink. When she got him a glass of milk she looked at the clock and noticed that it was 3 a.m. As she went back to bed, she heard someone walking in the driveway. She looked out of her bedroom window and saw Jerry Holsapple "stumbling to his room." She said she watched him enter his room in the motel, turn on a light, and then came back outside to sit on a chair. She noticed that he was wearing a T-shirt.

Lora Hutson, the former wife of the defendant, testified that the knife in question belonged to the defendant.

Marion Lammers, an employee at Sherman's Grocery in Sandoval, testified that Sheldon Apple was a regular customer of the store and she knew that he and Pat Armstrong were friends. Sheldon Apple had come into the store on August 28, 1971, some time after 5 p.m., and she informed him that Mrs. Armstrong had been killed. She said Mr. Apple dropped his head and then finished his shopping, but said nothing.

The defendant testified that on August 28, 1971, he had been residing for 2 months at the D & M Motel in Sandoval which was owned by his cousin, Bill Wilmoth. He was helping Wilmoth remodel one of the apartments in the motel so that the Wilmoth family could move into it. He also helped Mr. Wilmoth in his meat store near the motel, filling the milk cases and carrying meat.

He testified that on Thursday, August 26, 1971, he tore out the ceiling in a room in the motel to prepare to pour concrete. At about 6:30 p.m. he went to the meat store to clean up and get things ready for the morning. He worked there until the store closed at 9:30 or 9:45 p.m. and then went to his room where he remained for 30 or 40 minutes. He then proceeded to Fat's Tavern, which was about 6 blocks from the motel. He was wearing a white T-shirt, a blue short-sleeved shirt and light brown trousers. He said when he entered the tavern he sat at the bar and ordered a coke. He noticed that a friend, Henry Martin, and his wife,

Barbara, were in the bar, so he bought them a drink. Other acquaintances of the defendant in the bar were Danny Baddy and Ronnie and Harold Kelly. The Martins had a table to the right of the doorway. Henry Martin was playing pool with Baddy and the two Kellys. There were about 25 people in the bar and it was noisy.

As the defendant sat at the bar, the barmaid brought him a rum and coke which she said had been bought by Henry Martin. The defendant said he then moved down to the end of the bar, next to the table occupied by the Martins. He stood talking to the men who were playing pool for a little over an hour, during which time the defendant and Henry Martin bought each other about four drinks. As he talked to Henry Martin, a woman he did not know approached them and asked them to buy her a drink. He bought her a small beer and she took it back to the bar. This woman, who he now knows was Pat Armstrong, walked up to him 15 or 20 minutes later, called him by name, and asked him if he would walk her up to the Sandoval Y (the intersection of Route 50 and 51). He said he agreed to walk with her because he was going that way himself.

The defendant estimated that he and Mrs. Armstrong left the tavern between midnight and 12:30 a.m. He thought that Henry and Barbara Martin were still in the tavern when they left. He said that as they walked across the parking lot, Mrs. Armstrong stumbled on a hole and fell. After he picked her up, they began walking on the shoulder of the highway until they reached some railroad tracks where they crossed over to a sidewalk on the other side of the highway. The defendant said that Mrs. Armstrong was very unsteady, that she was hard to understand, and that he practically had to carry her because she was "pretty well soused."

The defendant stated that when they got to the Sandoval Grade School, which was about four blocks from Fat's Tavern, Mrs. Armstrong asked that they cross the street and go to the grade school playground. He said that she asked him to wait for her at the playground and, without giving a reason, she left him and went in a southerly direction. When she returned about 15 minutes later, she had a paper sack with two cans of beer in it. When she came back she was almost running. She handed the defendant a can of beer from which he took one sip and then returned to her. He noticed she was very nervous and excited and kept looking back in the direction from which she came. He asked her what was wrong but she would not tell him. He finally told her that if she would not tell him what was wrong, he was going to leave. When she did not respond, he left her in the playground, crossed to the other side of the highway and walked back to his motel room.

The defendant testified that as he approached his room, he decided to go to Miller's Truck Stop to get something to eat. He proceeded through

an alleyway by the motel and then headed up the highway toward the truck stop. As he was walking past a used-car lot, three men jumped him. The defendant said that he was hit in the head with something by a man with long dark hair and a beard, who was about 6 feet 2 inches tall. The blow brought the defendant to his knees but then he reached up and hit the man in the mouth with his right hand. He said that he also hit a second man who was shorter and clean-shaven, and that all three men then ran in the direction of the truck stop.

Holsapple testified that he followed the men for a distance but that he lost sight of them in the parking lot of the truck stop. He looked in Miller's Truck Stop and circled around it but he could not locate the men. He also searched a field behind Miller's before he returned to his motel. He said he was trying to locate the men so he could call Police Chief Weems and tell him what had happened. When he could not find the men, he did not bother to call Weems. He did not know what time it was when he returned to the motel after the fight.

He said that when he got up between 10 and 10:30 a.m. on Friday, August 27, 1971, his right hand was very sore and that his mother, who was living at the motel in cabin 6, came to his room and bandaged his hand. He did not see a doctor because he did not have much faith in doctors. He worked in the store a little, but mostly he stayed in his motel room on Friday because of his injuries. He did help Wilmoth close the store, but did not go out Friday evening.

On Saturday, August 28, 1971, the defendant helped in the store and also continued his work in remodeling the motel. About 5:30 or 6 p.m., the defendant accompanied Bill Wilmoth to Centralia to deliver some meat to a drive-in movie. When they returned to the store, Mrs. Wilmoth informed the defendant that the police were looking for him. He said he then went to his mother's cabin and waited for the police to return. When he saw a squad car on the highway, he stepped out and flagged it down. Deputies Swartzlander and Walker were in the car and they took defendant with them, telling him that Sheriff Sanders wanted to talk to him.

Defendant corroborated the fact that he had been questioned by Franklin and Sheriff Sanders. He stated that he did not learn Pat Armstrong's name until the following Monday morning. The defendant denied that he had ever been at Mrs. Armstrong's house. He also said that he had never seen her until the night they were at the tavern. He denied that the knife in question was his knife.

Bill Wilmoth, who was Jerry Holsapple's cousin by marriage, testified that he was the owner of the D & M Motel. He said that the defendant was living at the motel in August, 1971, and that they were remodeling

the motel at that time. Besides working in the motel, Holsapple also helped out in Wilmoth's meat store, which was right next to the motel. Wilmoth said he was with the defendant on Thursday, August 26, when they closed the store around 9 or 9:30 p.m. He next saw the defendant the following day at about noon when defendant came into the store. Holsapple had an injured hand which was bandaged, and when Wilmoth asked what had happened, the defendant told him that three men had jumped him the evening before at a car lot as he was walking to Miller's Truck Stop and that a fight ensued. Miller's is about four blocks from the motel. On the next day, Saturday, the defendant was in the store all afternoon. He accompanied Wilmoth to Centralia to make a delivery and when they returned, Mrs. Wilmoth told them the sheriff was looking for Holsapple. Holsapple said he wondered what the sheriff wanted; perhaps they wanted to question him about the fight he had. Defendant then went to his mother's cabin where the police picked him up. Wilmoth said he did not notice anything unusual about the defendant's behavior on either Friday or Saturday. After the defendant was arrested, the police returned to the motel and searched his room.

Mrs. Sue Wimberly, the mother of the defendant, testified that she lived in cabin 6 at the D & M Motel and that she had a conversation with the defendant on Friday evening, August 27, 1971. She did not notice that he had an injured hand at that time. On Saturday morning she had seen the defendant's injured hand and went to his room and dressed the hand for him. Her son was in her cabin when the police came to pick him up on Saturday evening. She did not notice anything unusual about his behavior on Friday or Saturday.

OPINION

The State's theory of the case is that the defendant left Fat's Tavern with deceased to go to her house and drink some beer. While there he killed her sometime between 2:30 a.m. and 3 a.m. According to Mrs. Day, Mrs. Armstrong was alive and fully clothed at 2:30 a.m. The defendant was seen staggering into his motel room at 3 a.m. The fact that the defendant left Fat's Tavern for the purpose of going to the Armstrong home, plus the finding of his knife there would be sufficient to prove that the defendant was in the Armstrong home at some time after he and the deceased left the tavern. The additional fact that when he was picked up he had extensive damage to his hands would permit the jury to find him guilty of her murder were it not for other factors which we must take into consideration.

■■ Under the State's theory of the case, Jerry Holsapple must have murdered Pat Armstrong between 2:25 a.m. and 3 a.m. on August 27.

The argument between Pat Armstrong and another person started at 2:25 a.m., and that person supposedly then left. If that person was Jerry Holsapple, instead of leaving, he must have hidden and attacked Mrs. Armstrong when she came back into her house after her conversation with Mrs. Day. However, considering the violence of the crime, the fact that the Armstrong house was only 15 feet from the Day house with the door open and Mrs. Day was awake at 2:30 a.m., it is very unlikely that he could have killed Mrs. Armstrong without Mrs. Day's hearing. Pat Armstrong was fully clothed when she talked with Mrs. Day. However, her extensively injured, naked body was found on a broken-down bed. Her dress and pants were forcibly removed, her body was further defiled after her death, and yet the defendant was seen entering his motel two blocks away only a half hour after Mrs. Day's conversation with Pat Armstrong. It is difficult to believe the defendant could have done so much in so little time. However, the jury was justified in disregarding the defendant's testimony relating to his fight with the three young toughs and the drinking of the beer in the schoolyard, because the testimony was just not believable. Having said that, however, we must also say that an incredible explanation denying guilt is not an admission of guilt. Even though it may not aid the defendant, it does not supplement the proof required of the State. It is hornbook law that the State must rely on the reliability of its own evidence and not the unreliability of the defendant's.

In order to sustain the conviction, the evidence must exclude any reasonable hypothesis of innocence. The evidence in this case does not adequately exclude the possibility that someone other than the defendant was in the cabin and killed Pat Armstrong sometime between 2:25 a.m. Friday and 2 a.m. Saturday, August 28, 1971. This was a period during which she could have died, according to the State's evidence. Mrs. Day testified that when Pat Armstrong came to the back door to ask that the police be called, Mrs. Day asked who was fighting her and Mrs. Armstrong replied that it was a man from southern Illinois. It seems unlikely, at best, that the deceased would not state the man's name if that unwanted guest were the defendant, whose name she knew. That she had asked Mrs. Day to call the police on other occasions indicates that she may have had serious difficulties with several callers. That the radio was heard to be playing at times and not at others may be because it was a clock radio. That Mrs. Day heard music on Friday night but only a humming when she entered the cabin late on the following Saturday afternoon is less easy to explain, if no one had entered the cabin in the meantime. That numerous witnesses did not notice any evidence of dog excrement in the house fits uneasily with the idea that no one let the dog

out between 3 a.m. Friday and 5 p.m. Saturday, a period of some 38 hours. That human hair matching neither that of the deceased, nor of the defendant was found on both a dress and a pair of torn underpants which had blood on them raises the substantial possibility, perhaps even the probability, that a person other than the defendant was the assailant. That no blood of defendant's type was found, even though blood was splattered all over the cabin is another factor. The fact that no fingerprints of the defendant were found anywhere in the house is another factor, especially considering the State's concession that there was no effort to destroy fingerprints.

Sheldon Apple testified that he entered the cabin shortly after 5 a.m. Friday with a coffee cake as he did from time to time and noticed nothing different from the previous evening when he had been there for supper. He did not see the deceased and did not take the few steps from the kitchen table to the bedroom door (which was open when Mrs. Day entered the next day) because, he stated, Mrs. Armstrong always slept on the couch in the living room and sometimes went for early morning walks. He called for her once and left. If Apple was testifying truthfully, it would appear that Mrs. Armstrong had not yet been killed because after her death the premises were in such a condition that he would have noticed. Her empty shoes were in front of the couch, where Apple said she usually slept. Part of the room where Mrs. Armstrong's body was found was visible from the front door and plainly visible to anyone who came up to the kitchen table as Apple did. This part of the bedroom contained a bureau with an open drawer. Clothing visible from the kitchen was strewn on top of the bureau and on the floor. Apple testified that he did not pick up Mrs. Armstrong Saturday after he got off work at noon to take her to his house to do the cleaning as was his habit because, at her request, she had cleaned his house on the previous Tuesday. According to Mr. Apple, she gave no reason for wanting to clean on Tuesday when she had just cleaned his house 3 days earlier. Mr. Apple stated that he did not learn of Pat Armstrong's death until Saturday. On that day he got off work at noon and went to the grocery store only a few blocks from Pat Armstrong's house. While he was in the store he was told that Mrs. Armstrong had been killed. He stated he did not go to her house when he heard the news, but instead went home, arriving at 1:30 p.m. When told that the body was not found until later Saturday afternoon, Mr. Apple testified that he really had no idea what time in the afternoon he heard about the murder but he did not think it could have been as late as 6 p.m.

Marion Lammers testified that she worked at Sherman's Grocery and

told Sheldon Apple about the murder about 5 p.m., Saturday, and that when she did so he said nothing but dropped his head and went on doing his shopping.

The foregoing evidence demonstrates that at least one person other than the defendant entered the cabin during the period of time in which Mrs. Armstrong could have been killed. Others may have entered. Assuming that the jury believed the prosecution witnesses and disbelieved the defense witnesses, it cannot be said that the facts proved were inconsistent with any reasonable hypothesis of innocence. The most that the State proved was that the defendant was at the Armstrong cabin and that Armstrong may have been killed at about that time. Surely, the proof was not of such a "conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." *People v. Marino*, 44 Ill.2d 562, 580, 256 N.E.2d 770.

For the foregoing reasons, the judgment of the circuit court of Jefferson County is reversed.

Judgment reversed.

EBERSPACHER and CARTER, JJ., concur.