THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* FRED DEAN SMITH, Defendant-Appellee.

(No. 54136;

First District—April 1, 1971.

*Rehearing denied October 21, 1971.*

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and Matthew J. Moran, Assistant State's Attorneys, of counsel,) for the People.

Carbonaro, Carbonaro and Valentine, of Chicago, for appellee.

Mr. JUSTICE McGLOON delivered the opinion of the court as modified upon the denial of petition for rehearing:

The defendant, Fred Dean Smith, was indicted for theft (Ill. Rev. Stat. 1967, ch. 38, par. 16—1, (d—1)). Prior to trial the defendant made a motion to suppress, as evidence, various articles recovered by federal agents from a garage and a vehicle, both of which were located on private property owned by the defendant. The trial judge sustained the motion,

and the State prosecuted an appeal pursuant to Supreme Court Rule 604(a). We affirm.

The testimony of the defendant at the hearing on the motion to suppress was as follows: On or about noon on May 7, 1968, he was coming out of his garage which is connected to his house located in Oak Lawn, Illinois. There was a U-Haul truck parked in front of the garage. He testified that he had just closed his garage door and was walking from his driveway to his house when a car pulled up onto his driveway and the driver, whom he later identified as one of the F.B.I. agents involved in the case, jumped out and started running towards him "brandishing a gun" and shouting "get your garage door up." Smith stated that this agent did not identify himself. A minute later two other F.B.I. agents arrived in another car and identified themselves. Smith opened his garage door, and the agents searched his garage and the U-Haul truck. Smith testified that he inquired as to whether the agents had either an arrest or a search warrant, and he was informed by the agents that they possessed neither. Smith testified that he was not told he was under arrest until later when all parties present had gone into Smith's house.

Three of the four F.B.I. agents involved testified at the hearing on the motion to suppress. The first one to testify related the following: On May 6, 1968, he received information from the terminal manager at the Trans-Illinois Express Company in Chicago that the terminal had been broken into the previous night, and certain merchandise was taken from some of the trucks including twelve large air conditioners, six Seiberling tires and numerous cartons of clothing. Later in the day he was told by a fellow agent that the latter had received a tip from an informer. The informer had said that he had, on May 5, 1968, observed twelve cartons of air conditioners, six large truck tires and six cartons of clothing in the garage of the defendant's home. On May 7, 1968, the testifying agent together with three other F.B.I. agents and one Oak Lawn police officer conducted a surveillance of the defendant's premises beginning about 9:30 A.M. He testified that he and another agent were together in one car and moving from location to location until about 10:30 A.M. At that time he spoke with two members of the Oak Lawn Police Department and told them that he had reason to believe the defendant's garage contained stolen property, but he was unsure whether it was stolen from an intrastate or an interstate shipment. As a result of this conversation, one of the F.B.I. agents and an Oak Lawn police officer went to obtain a search warrant for the defendant's premises. The testifying agent then returned to the surveillance at approximately 11:45 A.M.

At approximately 12:40 P.M. he and his fellow agent were parked one-half block south of defendant's house. A U-Haul truck arrived and

was backed onto the defendant's driveway and up to the garage. The driver opened the garage door and began to load some boxes into the truck. At that point he gave an order by radio to converge on the house. His car pulled up in front of defendant's driveway; a minute later the other agent's car arrived fom the opposite direction. Upon arrival the testifying agent saw a box maked "Norge" in the open garage and observed a Norge air conditioner and six large tires in the back of the U-Haul truck which was also open. He identified himself to the defendant and gave him constitutional warnings. He told the defendant there was a search warrant en route to his house. At that time the defendant told his wife to call an attorney.

On cross-examination the agent testified that he personally did not observe the alleged loading activity prior to the order to converge. Rather he was told by the third agent located in another car that this was occurring. Further, he testified that he was the first agent to go onto the defendant's premises, and he expressly stated that neither he nor any of the other agents arrested the defendant. That testimony was as follows:

"QUESTION: And you (addressing agent) arrested him (Smith), is that correct?

ANSWER: I did not arrest him.

QUESTION: Did (naming fellow agent) arrest him?

ANSWER: (Naming fellow agent) did not arrest him.

QUESTION: Nobody arrested the defendant, is that correct?

ANSWER: That is correct."

The F.B.I. agent who had received the informer's tip testified as follows: On May 6, 1968, he received a tip from an informer to the effect that the informer had observed twelve cartons of Norge air conditioners, six large truck tires and numerous cartons of clothing in the defendant's garage on the evening of May 5, 1968. The agent stated that this informer had given information on previous occasions which had resulted in several arrests and two convictions. The agent said he had talked with the informer on 25 or 30 occasions in the past. The agent also testified that he received other information that an "Egyptian Truck Lines" truck was parked in defendant's driveway on the afternoon of May 5, 1968, and it was observed that merchandise was loaded from the truck into the garage. It is not clear from the record whether this latter information was provided by the same informant as discussed above. Subsequently, on May 7, 1968, he went with an Oak Lawn police officer to procure a search warrant and was not present when the alleged arrest of the defendant occurred.

The testimony of the third testifying agent was substantially the same

as that of the first agent with the exception that he stated he was the one who observed the defendant engaging in loading activities involving tires and cartons at which point he gave the order to converge to the other two agents. On cross-examination it was brought out that in a previous hearing, on an earlier motion to suppress, held in Oak Lawn, he had not specifically mentioned "tires and cartons" being loaded. At that time he testified only that he "saw loading activities going on." Nor did he mention any specific items in an investigation report he wrote after the day's events of May 7, 1968. This report was read into the record by defense counsel.

At the close of the hearing the trial judge sustained the motion to suppress concluding that the federal agents did not actually see what specific items were in the garage until they had trespassed onto the defendant's private property.

On appeal the State argues that there was probable cause to arrest the defendant based on the personal observations of a reliable informant, corroborated by police surveillance, that a valid arrest ensued and any search was one made incident to such lawful arrest. Further, they contend that the arrest was justified by the prospect of imminent flight by the defendant with the merchandise. The State also argues that the evidence seized in this case was in "plain view" and therefore lawfully seized by the agents. The State makes the additional argument that the legality of the agents' conduct must be determined by its reasonableness.

■■ At the outset of our discussion we note that the conduct of the federal agents here is binding upon the State. *People v. Wilson* (1962), 24 Ill.2d 425, 182 N.E.2d 203 established that the State cannot divorce itself from the conduct of federal officers when it undertakes prosecution in a case where all the evidence is secured by or under their direction. *Cf. Roviaro v. United States* (1956), 353 U.S. 53.

If we were to characterize this case based upon the conduct of the law officers, we would have to say this is a situation where they acted correctly but where they acted too soon. There is little question that based on the information in their possession the federal agents in this case had sufficient probable cause to justify the issuance of a search warrant covering the defendant's premises. Their efforts in going to procure one gives credence to the belief that they well knew this was the correct procedure. In fact, a search warrant was subsequently issued by the Oak Lawn magistrate. Nevertheless, the agents acted without waiting for the return of the warrant and went upon the private property of the defendant to seize the evidence in question. On appeal the State seeks to justify that conduct by arguing that in going on the property of the defendant the agents did so with probable cause to

arrest him. At the hearing on the motion to suppress, the trial judge could not accept this argument, nor can we accept it now.

■■ Whether, when the officers in this case went onto the defendant's property they had probable cause to arrest him is doubtful. However, the testimony of the agents as indicated in the record was that no arrest of the defendant was ever made. This testimony stands uncontradicted as to the period of time from the agents' initial arrival through their seizure of the evidence sought to be suppressed. The agents possessed no warrant, and since, as we shall discuss, we find no merit to the other arguments of the State in support of this warrantless search, the agents' seizure of the evidence here can only be supported, given the facts of record, if it was incident to a lawful arrest. (*Brinegar v. United States* (1948), 338 U.S. 160.) There was no arrest, and thus the seizure must fail. *Johnson v. United States* (1947), 333 U.S. 10.

The State pursues its argument that, in fact, an arrest did take place and urges that the express testimony to the contrary by one of the agents who was on the scene is not determinative. In support of this argument the State cites *People v. Mirbelle*, 276 Ill.App. 533, wherein the court discusses the nature and elements of a valid arrest at length. It said at page 541:

"An arrest is the taking of a person into the custody of the law. It has also been judicially defined as the taking, seizing, or detaining the person of another; touching or putting hands upon him, in the execution of process, or any act indicating an intention to arrest  *  *  *. An arrest in the strict legal sense of the term, involves three elements: authority, intention, and a restraint of the person  *  *  *. There must be an intention, understood by the one arrested to accomplish the arrest  *  *  *. A restriction of the right of locomotion is the most characteristic element of the arrest  *  *  *. An arrest is effected when the party is brought within the power of the officer, an actual manual touching not being essential." (2 Am. & Eng. Ency. of Law [2 ed.] 834—6).

■■ There is no question that the requisite authority for an arrest existed here. That there was the necessary taking, seizing or restraint of the person is brought into question by the testimony of the agents. Although Smith testified that the agents came running onto his property manifesting their weapons, which conduct certainly would have been sufficient to evidence restraint, the agents testified differently. They recounted that they walked on the property, identified themselves to Smith and began to observe the contents of the allegedly open garage and truck. This conduct does not necessarily establish a restraint. Nor does the fact that Smith remained in the presence of the agents establish

such restraint. He was on his private property, the site of his dwelling place, from which he is not obliged to quit himself under any circumstances.

■■ Leaving the question of restraint aside, however, we submit the analysis breaks down completely when examining intentions. It simply cannot be said the necessary intention to arrest existed on the part of the agents nor that any such intention to arrest was understood by the defendant. From the defendant's point of view, as to whether he perceived an intention to arrest, it seems clear that he had some doubt as to where, if ever, he was actually arrested. He testified first that he was arrested on his driveway and then upon further questioning that the arrest did not occur until later when all parties had gone into the defendant's house, or at least the first time he was told he was under arrest was in the house.

In order to determine the agents' intentions, we have only their actions and words to go by. Their actions are inconclusive and controverted. As for their words, the most relevant testimony would be that of the agent who was one of the two agents, and the only one of the two to testify, who first entered defendant's property, approximately three to four minutes ahead of the third agent. His testimony is unequivocal to the effect that there was no arrest of the defendant. We conclude that the instant case does not meet the requirements for a valid arrest as laid out in the *Mirbelle* case.

■■ Finally, the State argues that the test to be applied to the agents' conduct here is whether or not they acted reasonably. The State cites *United States v. Rabinowitz,* 337 U.S. 56; *People v. Davis,* 34 Ill.2d 38; *People v. Erickson,* 31 Ill.2d 230. They note the proposition that arrest without a warrant is proper where an officer has necessary grounds to believe a crime has been committed and the person arrested is the one responsible, citing *People v. Ivory,* 38 Ill.2d 339; *People v. Jones,* 31 Ill.2d 42. Again, we have no quarrel with any of the holdings in these cases. However, they beg the question. In the *Rabinowitz, Jones, Davis* and *Ivory* cases, the court found there was a valid arrest and the searches that subsequently occurred were upheld as incidental to such arrest. The *Erickson* case involved the reasonableness of the search of an auto which police had stopped on a public road for a traffic violation. The car and defendant driver were under arrest and taken to the local police station where the car was searched without consent, and incriminating evidence was found. The Supreme Court reversed the defendant's conviction. The Court noted at page 233:

"* * * the absence, in the case of moving vehicles, of an opportunity to secure a search warrant is frequently cited as the reason for

sustaining such searches. But, in all cases the search must be for specific property, and may not be exploratory and made solely to find evidence of guilt."

■■ We wish now to address ourselves to the portrayal of specific facts of the case. The State has consistently urged that Smith's garage door was open, that the agents (after entering upon Smith's private property) identified themselves and gave Smith the required constitutional warnings, that Smith was engaged in loading the truck when the agents moved onto his property, and that the merchandise was in "plain view" from the public street. These are all matters of fact which at very least were all expressly controverted by the defendant Smith. Were there a finding in favor of the State of these matters, a different case would be presented. However, no finding in favor of the State was made on any of these matters. Rather, the trial judge who observed all the witnesses, listened to all the testimony and was obviously in the best position to determine these matters ruled against the State and for the defendant on the motion to suppress. In so doing he made an express finding against the contention that the merchandise was in "plain view" from the public street. This is clearly reflected in the record which states at page 102:

"MR. STAMOS: * * * There was no search here, Judge, everything was on view. Therefore, the basis of * * *

THE COURT: It was on view after there was a trespass on this man's house or curtilage."

And further, set out at pages 102 and 103:

"MR. STAMOS: They saw in the garage, the thing was opened. There was no invasion.

THE COURT: In my opinion, this officer (naming the agent), when he sent the other in, from his prior testimony in the case, he said he didn't know what was in there.

MR. STAMOS: He said he saw certain unloading activities.

THE COURT: They were on the premises.

MR. STAMOS: They were not on the premises, Judge, they were on the public street. The door was open to the garage from the public street. At no time did they ever—

THE COURT: They knew and you know and I know that the fact is that they went to get the warrant and it was too late. It shows what the situation was. All they had to do was stand in front of the truck and wait.

The motion to suppress the evidence will be sustained."

The State has cited *People v. Bridges*, 123 Ill.App.2d 58; *People v. Sylvester*, 43 Ill.2d 325; and *People v. Davis*, 33 Ill.2d 134 in support of

this "plain view" doctrine. We have no quarrel with these decisions except that the facts of the instant case are distinguishable. None of the cited cases involve invasion of private property. In *Sylvester* and *Bridges*, the court found the seized items had been abandoned on public thoroughfares. *Davis* (33 Ill.2d) was a classic "plain view" case where the officer having stopped defendant's car saw a tinfoil packet containing heroin lying on the car floor.

■■ The State also cites the cases of *People v. Sprovieri*, 43 Ill.2d 223 and *People v. Barbee*, 35 Ill.2d 407 which did involve entry onto defendant's private property. However, in each of these cases the trial court expressly found that the officers had probable cause to arrest based on previous events. Further, the defendant was in each of these cases still at large. There is little question that under such circumstances the police may enter on private property to look for defendant. The same is generally true where they are responding to a call or an emergency. Thus, in *People v. Marino*, 95 Ill.App.2d 369, cited by the State, that was the situation. There the police were checking out a call by defendant's neighbor that defendant was engaged in suspicious activity in his garage. The police upon arrival pulled their car onto the driveway and immediately, as they were emerging from the car, several people began running from the garage in all directions. It was held that at that moment, virtually before the police had done a thing, that probable cause to arrest arose.

■■ This court rejects the argument of the State that the arrest was valid because of exigent circumstances; namely, the defendant's flight with the evidence seemed imminent. This argument also fails with the testimony that no arrest was ever effected. However, even had an arrest occurred, it could not be supported on these grounds. All of the testimony indicated that the defendant was, upon the arrival of the agents, either standing outside his garage or walking towards his home. There was nothing in the record to indicate he was in the vehicle. We note the trial judge's response to this argument wherein he said, "All they (the agents) had to do was stand in front of the truck and wait."

We wish to note that our holding is not to be construed as saying that in all such cases police officers are required to wait until the defendant begins flight. We say only that the record gives no evidence of any attempt at flight. There is only the controverted testimony of the agents that there was "loading activity." When combined with the express finding by the trial judge that the agents did not recognize any of the items from their position outside Smith's property, we have a situation which, presented in the light most favorable to the State, portrays the

defendant on his property loading unknown goods into a truck. This is hardly a situation which supports an argument that "exigent circumstances" demanded the agents' action.

We further note, as did the trial judge, that if the defendant's flight was of such concern, the agents could have simply parked their cars on the public street in front of his driveway thereby preventing his departure. This is not to say that in every situation where flight appears imminent or has actually begun the police are "required to give the defendant a running start" as suggested by the State. Rather, it is an observation that a course of action was available, given the specific facts of this case, which would have accommodated the purposes of the agents (*i.e.* prevent flight) and still remained consonant with the defendant's right not to have his private property unjustifiably invaded.

Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P. J., and DEMPSEY, J., concur.