**STATE of Missouri, Respondent,**

v.

**Charles William WHITE, Appellant.**

**No. 62191.**

Supreme Court of Missouri,
Division No. 1.

Sept. 8, 1981.
Rehearing Denied Oct. 13, 1981.

Donald O. Tripp, Liberty, for appellant.

Henry Herschel and Steven H. Akre, Asst. Attys. Gen., Jefferson City, for respondent.

GUNN, Special Judge.

Defendant was convicted of capital murder, § 559.005, RSMo Supp. 1975. His sentence was life imprisonment without eligibility for probation or parole for fifty years, § 559.011, RSMo Supp.1975. His points of appeal are manifold, but we find none has merit and affirm the judgment.

The defendant's targeted victim for murder was Roxanne Newberry, wife of Floyd B. Newberry (Floyd Jr.). The *quid pro quo* was $60,000 to be paid to defendant and Floyd Jr.'s father, Floyd W. C. Newberry (Floyd Sr.), from substantial insurance proceeds on Roxanne's life. The state's primary witness against defendant was Floyd Sr., although there was additional evidence presented to support the conviction.

In February, 1976, Floyd Jr. approached his father with the general scheme to kill Roxanne for the insurance money. Floyd Sr. in turn contacted defendant who was an employee in his upholstery business. Apparently defendant was not reluctant to be the perpetrator of the murder. On April 22, 1976 defendant made his first, unsuccessful effort at killing Roxanne. As Roxanne left her place of employment defendant shot her in the neck with a .22 caliber pistol and beat her with a lead pipe to ensure her demise. Amazingly, Roxanne survived the first brutal attack. She trav-

eled to Florida for a recovery period, but plans for her death continued with defendant and a companion, Rodney Strickland, going to Florida intending to fulfill their deadly purpose. But defendant's bibulous habit thwarted him in his quest for Roxanne's death—he was in a drunken stupor most of the time while there. Separate trips to Florida were made by both Newberrys and again by Floyd Sr. and Strickland, but though life-threatened, Roxanne was left undisturbed.

The defendant and the Newberrys continued their plans for Roxanne's death. On June 18, 1976, after Roxanne had returned to Missouri, Floyd Sr. drove defendant to a schoolyard behind Floyd Jr.'s home. Floyd Jr. unlocked a basement door to his home to admit defendant, who entered the house, went to Roxanne's bedroom, bound and sexually ravished her and then killed her by cutting her throat from ear to ear and the back of her neck, nearly severing her head from her body.

■ The first issues in defendant's appeal are whether twelve jurors must deliberate to return a valid indictment and whether the grand jury selection process was discriminatory. On December 19, 1978, the grand jury of Clay County met, deliberated and returned an indictment against defendant on the charge of capital murder. When impaneled, the grand jury consisted of twelve members plus one alternate. However, only eleven members were present to deliberate, with all eleven voting in favor of the indictment.[1]

Under these facts we find no deficiency or flaw in the number of grand jurors returning the indictment against the defendant. Mo.Const. Art. I, § 16 provides "[t]hat a grand jury shall consist of twelve citizens, any nine of whom concurring may find an indictment or a true bill. . . ." This constitutional provision has been codified in §§ 540.010 and 540.250, RSMo 1978 with the latter section providing that "[n]o indict-

ment can be found without the concurrence of at least nine jurors. . . ."

Long ago, in State v. Connors, 233 Mo. 348, 135 S.W. 444 (1911), in construing a forerunner statute with language identical to § 540.250, RSMo 1978, the court held, quoting from 17 Am. & Eng.Ency.Law, p. 1281:

> If a sufficient number of grand jurors has been impaneled, the absence, death, excusal, or discharge of one or more jurors does not affect the organization of the grand jury, or disable it from investigating criminal charges and finding indictments, providing the minimum number which is required to concur in the finding of an indictment remains and does so concur.

135 S.W. at 445. The foregoing rule is still followed, and so long as at least nine grand jurors deliberate and vote for the indictment, it is valid. The holding is consonant with decisions of other jurisdictions finding that the numerical requirement of twelve pertains only to the impaneling of the grand jury and that a lesser number may deliberate and return an indictment. Lightfoot v. State, 64 So.2d 261, 265 (Fla. banc 1953); State v. Birbiglia, 149 La. 4, 88 So. 533, 541 (1920).

■ Neither is there merit to defendant's contention that the grand jury selection process was discriminatory in that it did not consist of a fair cross section of the community. The decisive issue in this regard is whether discrimination actually occurred in the selection of the grand jury, with the burden resting on defendant to establish that actual discrimination exists. State v. Ramsey, 355 Mo. 720, 197 S.W.2d 949, 952 (banc 1946); State v. Duncan, 616 S.W.2d 87, 88 (Mo.App.1981); State v. Johnson, 539 S.W.2d 493, 511 (Mo.App.1976), cert. denied, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). The evidence on which defendant bases his charge is that the jurors were drawn from the grand jury wheel only after

---

1. There was some conflict in the record as to whether eleven or twelve grand jurors were present to deliberate. The court reporter's notes indicate twelve were present, but the

Clay County prosecuting attorney acknowledged only eleven were present. However, in light of our ruling, the conflict is immaterial.

their names had been randomly selected from a group of persons of "reputable, honest character." There is no evidence that this particular method of choosing grand jurors deprived defendant of jurors selected from a fair cross section of the community. *State v. Cuckovich*, 485 S.W.2d 16, 21 (Mo. banc 1972), concerning a grand jury "composed of people outstanding in civic affairs," is on point in this regard. Defendant's first point dealing with the grand jury process and proceedings is without merit.

■ The murder weapon was identified as a knife that had been confiscated from defendant by federal authorities in connection with an earlier counterfeiting investigation against him. After his release on the counterfeiting charge, defendant's request for the return of his knife was refused. The knife was ultimately delivered by federal authorities to the Clay County sheriff's office in connection with Roxanne's murder. Defendant's challenge against the use of the knife as evidence in this trial is that his property had been taken from him without just compensation. Defendant argues that as the exclusionary rule applies to a fourth amendment violation, so, too, should it apply to a fifth amendment infraction. Defendant cites us no authority for such a proposition, and an examination of the circumstances in this case reveals that defendant's contention is destitute of merit.

■ Defendant does not assert that the federal authorities acquired the knife by illegal means.[2] Nor does he assert that there is anything illegal about the Clay County sheriff's office possessing the knife. Through Newberry, police were aware of defendant's involvement in the murder, which had been committed with a knife or other sharp instrument. Evidence legally obtained by one police agency may be made available to other such agencies even for a use different from that for which it was originally taken. *United States v. Gargotto*, 476 F.2d 1009, 1014 (6th Cir.1973); *Gullet v. United States*, 387 F.2d 307, 308 (8th Cir.1967), *cert. denied*, 390 U.S. 1044, 88 S.Ct. 1645, 20 L.Ed.2d 307 (1968).[3] Defendant's right to a restoration of impounded property does not accrue until after the property has ceased to be necessary for the purposes of justice. 79 C.J.S. Search and Seizure § 93 (1952). It matters not that defendant went uncompensated for the murder weapon, as his allegation of unlawful appropriation relates to a totally collateral matter. If defendant's property were taken from him unlawfully, his remedy lies in a proper motion filed against federal authorities pursuant to Federal Rule of Criminal Procedure 41(e). *Mayo v. United States*, 413 F.Supp. 160, 161 (E.D.Ill.1976). Also, *see State v. Richards*, 334 Mo. 485, 67 S.W.2d 58, 61 (1933); 68 Am.Jur.2d, Searches and Seizures, §§ 117, 118 (1973), regarding return of contraband.

■ Defendant's next allegation of error arises in connection with hair samples taken from him pursuant to an order of the United States District Court and admitted in evidence. No force was asserted in removing the hair. A few were pulled from defendant's head and body without any resistance. Defendant pulled and gave samples of his own pubic hair. Defendant argues that the procurement and use of hair samples in evidence involved the use of illegal force, compelled him to be a witness against himself and was an unreasonable search and seizure. Furthermore, he maintains that the district court was without authority to order their taking. Defendant relies primarily on *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), a case in which a suspect's stomach was pumped to

---

**2.** Evidence seized by federal officers in violation of the fourth amendment may not be used in a state criminal prosecution. *United States v. Fay*, 344 F.2d 625, 629 (2d Cir.1965); *People v. Smith*, 5 Ill.App.3d 341, 275 N.E.2d 480, 483 (1971).

**3.** In *United States v. Lewis*, 504 F.2d 92, 104 (6th Cir.1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975), the 6th Circuit Court of Appeals refused to convict the trial court of error for failing to suppress evidence which Kentucky police officers lawfully seized and turned over to federal authorities for prosecution purposes, even though the defendant had requested its return from the state authorities.

induce vomiting and produce ingested evidence. Such use of force "shock[ed] the conscience," resulting in a fourteenth amendment violation. 342 U.S. at 172, 72 S.Ct. at 209. But the taking of hair samples is substantially different from the situation in *Rochin.* Here, the taking and use did not violate any constitutional safeguards. The securing of such samples is only a slight personal intrusion and does not infract due process rights. *Wolfe v. State,* 613 S.W.2d 892, 894 (Mo.App.1981). *Accord, United States v. Jackson,* 448 F.2d 963, 971 (9th Cir.1971), *cert. denied,* 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972); *United States v. D'Amico,* 408 F.2d 331, 333 (2d Cir.1969); *Grimes v. United States,* 405 F.2d 477, 479 (5th Cir.1968).

■ Nor does the hair removal constitute an unlawful search and seizure. The fourth amendment provides no absolute barrier to the state's making a minor intrusion into an individual's body. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), so holds, with hair removal in the manner accomplished here being permissible. *Accord, Wolfe v. State,* 613 S.W.2d at 894.

■ Further, there is no fifth amendment proscription against the use of non-testimonial physical evidence, which would encompass hair samples. *Schmerber v. California,* 384 U.S. at 764, 86 S.Ct. at 1832. *See United States v. Euge,* 444 U.S. 707, 713, 100 S.Ct. 874, 879, 63 L.Ed.2d 141 (1980). Because the district court's order compelling production of the hair samples does not violate any constitutional provisions, no error occurred in overruling the defendant's pretrial motion to suppress them.

Defendant also challenges the admissibility of testimony from the state's expert witness comparing Roxanne's hair samples and those taken from the murder weapon, as well as other hair comparisons. Specifically, he argues that microscopic comparison of hair lacks sufficient scientific acceptance and that the opinion of the state's witness was incompetent.

■ The admission of hair sample comparisons will depend on scientific support for their reliability. *See State v. Biddle,* 599 S.W.2d 182, 185 (Mo.banc 1980), (regarding lack of scientific support for reliability of polygraph examination), and *State v. Stout,* 478 S.W.2d 368 (Mo.1972), (finding lack of support for scientific reliability for neutron activation analysis of blood sample). But it is a fundamental precept that the trial court is vested with substantial discretion in determining whether a witness possesses requisite qualifications to express an opinion. *State v. Jones,* 594 S.W.2d 932, 938 (Mo.1980); *State v. Stevens,* 467 S.W.2d 10, 23 (Mo.1971), *cert. denied,* 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971); *State v. Gardner,* 600 S.W.2d 614, 618 (Mo.App.1980), *cert. denied,* 449 U.S. 1020, 101 S.Ct. 585, 66 L.Ed.2d 481 (1980).

■ The forensic expert testifying for the state was a chemist with a degree in biology and chemistry. He had undergone extensive training, and for five years his primary work had involved analyses of hair, fiber and body fluid. He had made over one thousand comparisons each year, with his procedures conforming to the current state of the art. He testified that the techniques employed are considered reliable and are accepted by the scientific community; that microscopic hair inspections can identify the source of the hair, its racial characteristics and its anatomical components. He took the hairs from the defendant and those retrieved from the the crime scene, mounted them on a microscopic slide and viewed them with a specially designed scope. The expert testified from the comparisons and concluded that hair samples taken from the murder scene matched those taken from the defendant. There was at least a sufficiently high incidence of similarity between the hair comparisons to allow an expression of the expert's opinion as to their source as was the situation in *State v. Kleypas,* 602 S.W.2d 863, 869 (Mo.App. 1980).

Hair comparisons have been accepted in Missouri, as well as in other states.[4] *State v. Kelly*, 539 S.W.2d 106, 109–10 (Mo.banc 1976); *State v. Yowell*, 513 S.W.2d 397, 401 (Mo.banc 1974); *State v. Merritt*, 591 S.W.2d 107, 112–13 (Mo.App.1979); *State v. Dayton*, 535 S.W.2d 479, 483 (Mo.App.1976). While it is not involved here, the neutron activation analysis modality for testing hair samples has also been approved. *State v. Stevens*, 467 S.W.2d at 23. Under the circumstances of this case the state's expert witness was properly qualified to express his opinion as to hair comparisons. *See State v. Maxie*, 513 S.W.2d 338, 344 (Mo. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 40 (1975); *State v. Stevens*, 502 S.W.2d 335, 338 (Mo.1973). *A fortiori*, a sufficient basis exists to support a finding of scientific reliability of hair comparisons.

Because of the special training required to test and compare hair fibers, the expert's stated opinion involved no invasion of the jury's province. *See State v. Stevens*, 467 S.W.2d at 23; *State v. Sager*, 600 S.W.2d 541, 573 (Mo.App.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1348, 67 L.E.2d 334 (1981). And, certainly, the hair comparison evidence was material and relevant.

■ The next complaint is that the trial court erred in permitting Floyd Sr. to comment on the episode involving defendant's first attempt on Roxanne's life as being evidence of another crime. Evidence of another crime is inadmissible unless it has some legitimate tendency to establish the defendant's guilt of the crime charged. *State v. O'Neal*, 618 S.W.2d 31 (Mo.1981); *State v. Lue*, 598 S.W.2d 133, 137 (Mo.banc 1980); *State v. Bellew*, 612 S.W.3d 401, 402 (Mo.App.1981). However, evidence of other crimes is competent if it tends to establish motive, intent, absence of mistake or accident, common scheme or plan, or identity of the person charged. *State v. Mitchell*, 491 S.W.2d 292, 295 (Mo.banc 1973); *State v. Barnett*, 611 S.W.2d 339, 341 (Mo.App.1980). The evidence of the first assault on Roxanne clearly falls within the ambit of a common plan or scheme to murder her and establishes intent as well. Both attacks were part of a plan to kill Roxanne and collect insurance proceeds. When the first attempt failed, plans for the second, and final, assault were formulated—all as part of a continuing scheme. The evidence of the first attempt on Roxanne's life was properly admitted.

■ Defendant's next contention is that the court erred in failing to order that a saliva test be taken from Floyd Sr. while he was in the custody of the federal authorities. Pursuant to Rule 25.04, the court may order the state to disclose material and information if the request is reasonable.[5] Defendant's request arose from the fact that semen stains were found on the sheet in Roxanne's bedroom. Tests of the stains produced no identifiable blood type nor any helpful information in the investigative process but tests taken yielded only ambiguous and meaningless results. Defendant brings forth the argument that if a so-called non-secretor had spilled semen on the sheet, no blood type could be determined, as a non-secretor's blood is not disclosed, whereas a secretor's blood type could be analyzed.[6] Defendant is a secretor, as is

---

4. *State v. Wilson*, 217 La. 470, 46 So.2d 738 (1950), *aff'd* 341 U.S. 901, 71 S.Ct. 611, 95 L.Ed. 1341 (1951).

 This on hair comparisons from Comment, *Scientific Evidence in Rape Prosecutions*, 48 U.M.K.C.L.Rev. 216, 231 (1980):

 ... [A]dmissibility of hair comparison evidence has followed a dual course, depending on whether the state elected to employ the more costly neutron-activation test or to rely on the simpler, but less specific, "range of variance" testimony from experts. One line of Missouri cases joins the majority of states in admitting hair comparison evidence.

5. Defendant argues that since Floyd Sr. was in the custody of the federal authorities, the state is under an obligation pursuant to Rule 25.-04(C) to use diligence and good faith effort to secure the material from the federal government. Of course, there was no guarantee that Floyd Sr. would have cooperated, even if the court had granted the order.

6. *See Comment, supra* note 4, at 229, for information regarding tests on secretors and non-secretors.

80% of the population. A saliva test reveals whether one is a secretor or non-secretor. Defendant's argument thus involves this convoluted four step syllogistic process: defendant is a secretor; a secretor's blood type can be determined from a semen or saliva specimen, whereas a non-secretor's cannot; a blood type determination could not be made from specimen found on the death bed sheet; ergo, the specimen came from a non-secretor—someone other than defendant. Thus—so reasons defendant—Floyd Sr.'s saliva should be tested. But defendant's argument presupposes that tests produced positive information. They did not, and his argument must fall for being based on a faulty premise. It is thus needless to slip into the miry bog of a scientific discussion on the subject. Such a discourse would infuse no worth into this point on appeal. Since the tests on the semen stains failed to establish that they were produced by either a secretor or a non-secretor, it would be of no probative value to determine in which classification Floyd Sr. belonged.[7]

Furthermore, the results of any saliva tests requested by defendant would be so speculative as to be without material relevance or any benefit to him. The trial court cannot be convicted of any abuse of its discretion under Rule 25.04 in refusing to attempt to obtain a saliva test from Floyd Sr. through federal authorities holding him. The request is simply not reasonable under the circumstances.

■■■■ In connection with the foregoing point, defendant requested the state to make available a section of a bed sheet on which two or three seminal stains were found. The state did in fact comply with defendant's request by producing a portion of the sheet containing a seminal stain, which, when subjected to testing, spawned only ambiguous and inconclusive results. The tests were performed for the defendant by the state's forensic expert. Defendant was also given access to all the state's evidence and permitted access to its laboratory. Defendant's second request for another piece of sheet with a seminal stain on it was denied at trial. Defendant requested a mistrial as sanction for the state's failure to deliver the second stain. If, in fact, the state failed to comply with the rules of discovery, an abuse of the trial court's discretion in failing to impose the sanction of mistrial occurs only if there is a resultant fundamental unfairness to the defendant. *State v. Royal*, 610 S.W.2d 946, 951 (Mo. banc 1981). Under the circumstances, no fundamental unfairness ensued by denying sanctions.

Approximately one hour after the first attack on her life, Roxanne gave a statement to a police officer that "she was attacked and beaten by a negro man with a piece of pipe." Defendant contends that the testimony of the police officer relating the statement was impermissible hearsay. *See State v. Valentine*, 587 S.W.2d 859, 860–61 (Mo.banc 1979). It was not.

■■■■ The purpose of the hearsay rule is to "secure trustworthiness of testimonial assertions by affording the opportunity to test the credit of the witness . . . ." *State v. Kirkland*, 471 S.W.2d 191, 193 (Mo.1971). There are many recognized exceptions to the hearsay rule in instances where special circumstances ensure the trustworthiness of the assertions. One such exception is the *res gestae* doctrine, which refers to "those exclamations and statements made by either the participants, victims or spectators to a crime immediately before, during, or immediately after the commission of the

---

7. The hopeless, speculative basis for defendant's request for some benefit from the saliva test is best revealed in his brief:

 If appellant had a tissue (saliva) specimen from Floyd Newberry, tests might have determined that Floyd Newberry, Sr. was a non-secretor which might have explained *why* John Wilson [state's forensic expert] couldn't obtain a blood type from the tissue (semen) found to have been deposited shortly after the victim's blood. Further, if Floyd Newberry is a non-secretor, further testing might have been done (had the state provided appellant the opportunity . . . ) that would have excluded the appellant as the individual who deposited the semen and put Floyd Newberry, Sr. within the 20% of people who could have deposited it.

crime, when the circumstances are such that the statements were made as a spontaneous reaction or utterance inspired by the excitement of the occasion and there was no opportunity for the declarant to deliberate and to fabricate a false statement." *State v. Hook*, 432 S.W.2d 349, 352 (Mo.1968),[8] (quoting 1 Wharton's Criminal Evidence, 12 Ed. § 279, p. 624); *State v. Scott*, 535 S.W.2d 281, 283 (Mo.App.1976).

The *Hook* definition of *res gestae* encompasses two different concepts. One excepts statements made contemporaneously with the event. The event need not be startling or exciting. The statement's trustworthiness is ensured by its contemporaneity. The other concept is the so-called excited utterance doctrine, which excepts statements made spontaneously as a result of a startling event. The temporal proximity between the event and the statement need not be simultaneous so long as the statement is provoked by the excitement of the event—an apparent spontaneous influence of the occurrence acting on the senses of the speaker—in which case it can qualify as an exception to the hearsay strictures. *State v. O'Neal*, 436 S.W.2d 241, 244 (Mo. 1968). In this case Roxanne, while in the hospital approximately one hour after the first attack had occurred, made the unsolicited statement that she had been beaten by a negro male with a piece of pipe. The police officer to whom the statement was made testified that Roxanne was being treated for lacerations and gunshot wounds and described her as being very excited, nervous, upset and talkative. It is clear that the statement was an excited utterance and thus an exception to the hearsay doctrine. Although she made the statement an hour after her attack, her emotions were still under the control of the excitement of the event. *See State v. O'Neal*, 436 S.W.2d at 244. There was no error in overruling the hearsay objection to the statement. And with the rejection of the hearsay objection, defendant's claim that he was denied the right to confront an adverse witness fails. Testimony admitted under an exception to the hearsay rule does not deprive a party of sixth amendment rights. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *Dutton v. Evans*, 400 U.S. 74, 80–81, 91 S.Ct. 210, 215–16, 27 L.Ed.2d 213 (1970); *State v. Newberry*, 605 S.W.2d 117, 125 (Mo.1980).

▮ Finally, defendant contends that the trial court erred in giving the state's verdict directing instruction, as it failed to make reference to the specific time of the offense or that defendant had acted alone in the commission of the crime. The evidence fully supported the instruction as given.[9]

No alibi defense was offered that would make time an important element. Since it was neither an element of nor essential to the homicide, there was no need to make specific reference to it in the instruction. *State v. Tettamble*, 394 S.W.2d 375, 379 (Mo.1965), *vacated and reversed on other grounds*, 386 U.S. 265, 87 S.Ct. 1034, 18

---

**8.** The *res gestae* doctrine has also been defined to include a statement made "contemporaneous with the event established by the principal act; it must spring from this act simultaneously with its occurrence, without any intervening interval or opportunity for deliberation in forming the statement." *State v. Hook*, 432 S.W.2d at 352, quoting Annot., 19 A.L.R.2d 581 (1951).

**9.** The instruction reads:

IF you find and believe from the evidence beyond a reasonable doubt:

First, that on or about June 18, 1976, in the County of Clay, State of Missouri, the defendant caused the death of Roxanne Newberry by cutting her, and

Second, that the defendant intended to take the life of Roxanne Newberry, and

Third, that the defendant knew that he was practically certain to cause the death of Roxanne Newberry, and

Fourth, that the defendant considered taking the life of Roxanne Newberry and reflected upon this matter coolly and fully before doing so,

then you will find the defendant guilty of capital murder.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the foregoing, then you must find the defendant not guilty of that offense.

If you do find the defendant guilty of capital murder, you will fix his punishment at life imprisonment by the Department of Corrections.

L.Ed.2d 42 (1967); *State v. Walker*, 357 Mo. 394, 208 S.W.2d 233, 237–38 (1948), and *State v. Siems*, 535 S.W.2d 261, 266 (Mo. App.1976); *see State v. Sager*, 600 S.W.2d at 574, concerning the importance of time when an alibi is asserted. The instruction set forth that the offense occurred "on or about June 18, 1976" and that defendant caused Roxanne's death. This was within the postmortem interval related by the pathologist. The precise moment of death is immaterial.

Defendant's contention that the instruction failed to indicate that he acted alone is baseless. The instruction is congruent with the evidence and conforms with the state's theory of the case. It was not necessary to prove that defendant acted alone to establish his guilt, so there was no need to refer to lack of complicity. The instruction is sufficiently specific.

Judgment affirmed.

MORGAN, P. J., DONNELLY, C. J., RENDLEN, J., and FINCH, Senior Judge, concur.

BARDGETT, J., not participating.