**STATE of Missouri, Plaintiff–Respondent,**

v.

**Darryl BRAZIL, Defendant–Appellant.**

No. 57213.

Missouri Court of Appeals,
Eastern District,
Division One.

July 9, 1991.

Lisa L. Preddy, Union, for defendant-appellant.

William L. Webster, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Presiding Judge.

Defendant, Darryl G. Brazil, (hereinafter defendant), was convicted on July 20, 1989, by a jury of one count of burglary in the first degree, one count of assault in the first degree and one count of armed criminal action. After being found to be a prior offender, the defendant was sentenced on August 17, 1989, to a fifteen year term of imprisonment for the burglary count to be served concurrently with a thirty year term of imprisonment for the assault count combined with a fifteen year term of imprisonment for the armed criminal action count to

be served consecutively to the other terms. This appeal follows.

The evidence adduced at trial viewed in the light most favorable to the verdict reveals that the victim, Deborah Sistrunk, who resided in Berkeley, Missouri and was the divorced mother of two minor children, Ishmael and Anthony, had been employed as an associate news producer at a St. Louis television station for nine years when the crime occurred. Sistrunk met the defendant through a mutual friend, Diane White, while they were working on a business proposal in the spring of 1988. While working on this business proposal, Sistrunk began having an affair with the defendant, engaging in sexual intercourse at least twice. Soon after this relationship began, Sistrunk became pregnant. When she told the defendant about the pregnancy, he reacted by telling her to have an abortion. Defendant was upset because he didn't want his affair with Sistrunk to ruin his relationship with his fiancee, Pamela Talley, who he had been living with for five years. Sistrunk told the defendant that she wanted to have the baby because she did not believe in abortion.

The defendant tried repeatedly to change Sistrunk's mind about not having an abortion and would call her frequently. These conversations would often deteriorate into the defendant using very abusive language and Sistrunk then hanging up the phone. Although the defendant didn't know at first where Sistrunk lived, he found this information out in November of 1988.

On January 7, 1989, the evening of the attack, the defendant called Sistrunk and asked if he could come over to visit her at her home. Sistrunk objected and told him that she didn't want to see him that evening, finally hanging up the phone. Later that evening, at 7:30 or 8:00 p.m., a young black man approximately seventeen years old who Sistrunk had never seen before knocked on her door. The man who was later identified as Monty Ross had allegedly been sent by Huel Perkins, an ex coworker of Sistrunk's to tell her about a meeting with Perkins the next morning—a Sunday. Sistrunk thought this was suspi-

cious and decided to call Huel Perkins. Sistrunk was not able to reach Perkins but left a message on his answering machine.

Later that night as Sistrunk was sleeping on the living room couch, she was awakened by the sound of the patio door of the kitchen opening. Monty Ross soon thereafter appeared in the living room. Ross told Sistrunk that he had been sent by someone to kill her but that he didn't want to do it. Ross proceeded to ask Sistrunk to engage in sexual intercourse with him but she declined. Ross then asked her to perform sodomy on him but she again declined. Ross then attempted to kiss her but she resisted and Ross pulled out a knife. After pushing Sistrunk to the floor in the living room, Ross stabbed her repeatedly around the neck and the upper part of the body. Ross also stabbed her in the hand. At some point Sistrunk stopped screaming and pretended to be dead. Ross believing her to be dead left the house and one of Sistrunk's children who had witnessed the stabbing called 911. Sistrunk was taken to the hospital and later identified her attacker from a photo lineup as Monty Ross.

Later on the night of the attack, while at Pamela Talley's house, where the defendant lived, Sistrunk's brother Sylvester Caldwell, saw a man that met the description of his sister's attacker. After Caldwell reported this information to the police, the defendant was called down on January 10, to the Berkeley Police Station for questioning. The defendant initially denied knowing anyone who would have wanted to injure Sistrunk, but upon further questioning the defendant admitted he knew who was responsible for the stabbing.

The defendant subsequently made a taped statement in which he admitted that he was upset and that Sistrunk had been nagging him. Defendant went on to state that he didn't want Sistrunk to have the baby because he was getting engaged to Pamela Talley. Defendant also admitted in his statement to the police that he had been drinking at a bar with Monty Ross earlier on the night the stabbing took place and that he had shown Ross where Sistrunk

lived. The defendant further stated that he stayed at the bar while Ross left and then later returned. After Ross returned to the bar, the defendant stated that he took Ross back to Talley's house in order to hide him.

■ Defendant's first point on appeal alleges the trial court's failure to strike for cause four members of the venire (Wade, Menzel, Gerst and Hempen) who stated that they could not render a verdict of not guilty if the defendant exercised his right not to testify, depriving him of his right to a panel of qualified jurors from which to make his peremptory challenges. We disagree.

The statements made by the venirepersons that the defendant relies on in raising this point occurred during voir dire when defense counsel was questioning the venire about the state's burden of proof and about each juror's feelings regarding the defendant's right not to testify. Upon reviewing defense counsel's voir dire of the jury, we find that any ambiguity that existed in regard to the meaning of each juror's responses was created by the confusing phraseology defense counsel used in posing his questions to members of the venire. When the prosecutor was given an opportunity to examine the challenged jurors, the alleged bias proved simply to be their misunderstanding of the meaning of defense counsel's questions. We find that the following questions by the prosecutor and the corresponding answers from each of the four challenged jurors reveal that when clear questions were asked the challenged jurors gave unequivocal assurances that they would not be biased against the defendant if he did not testify.

PROSECUTOR: Okay. And, Ms. Wade, the same set of questions to you. It's up to me to prove him guilty beyond a reasonable doubt and, if after hearing the evidence I present you have a reasonable doubt, can you find him not guilty if you don't hear from him? If you don't understand me, say so and I will try to rephrase (sic) it.

PANELIST WADE: Yes, I could find him not guilty.

PROSECUTOR: You understand that there is a difference between hearing what you might like to hear and what you may hear. So I may, you know, put on evidence and if you find there is not enough evidence there, there is just no link, you can walk him then even if you don't hear from him?

PANELIST WADE: (Nods her head)

PROSECUTOR: And going back to Mr. Hempen, I am going to do it again with you as well. There is a difference here. You know I talked about the disputed facts and the fact there may be certain things that you might want to hear, but you may not hear, and I asked if you could make a decision even though you may not hear everything?

PANELIST HEMPEN: Yes.

PROSECUTOR: And you answered it in the negative then. You didn't raise your hand. Now, I am going to go over the same set if (sic) circumstances with you. The constitution provides that every criminal defendant is entitled to be presumed innocent. That's anybody that sits at this table and accused of a crime. And he is presumed innocent until I prove him guilty through the evidence I present. So if you hear the evidence and you have a reasonable doubt as to whether or not he is guilty, (sic) do you understand that you will be instructed if you have a reasonable doubt that you have to walk him out that door? You have to find him not guilty. Can you follow that instruction?

PANELIST HEMPEN: Yes.

PROSECUTOR: Even if you would have liked to have heard from the defendant?

PANELIST HEMPEN: Uh-huh.

PROSECUTOR: And, Mr. Henzel (sic), the same set of questions to you. If after hearing the evidence presented by the state and the burden of proof being upon me, you have a reasonable doubt as to whether or not he is guilty, can you find him not guilty even though he hasn't testified?

PANELIST HENZEL (sic): Yes.

PROSECUTOR: If you are instructed to do that you can follow that instruction of law?

PANELIST HENZEL (sic): Yes.

PROSECUTOR: Do you think that that's fair?

PANELIST HENZEL (sic): Reasonably, yes.

PROSECUTOR: Reasonably?

PANELIST HENZEL (sic): Yes.

PROSECUTOR: Okay. And, Mr. Gerst, you had indicated earlier that you would want to hear from him?

PANELIST GERST: Yes.

PROSECUTOR: Now, that might be true that a lot of people might want to hear from him, but you understand he doesn't have to testify, any defendant accused of a crime doesn't have to testify?

PANELIST GERST: Yes.

PROSECUTOR: That's every person's constitutional right and you are not going to hold that against him, are you?

PANELIST GERST: No.

PROSECUTOR: Let me ask you this, okay: If, as I stated previously four times, I present evidence and you hear all my evidence and they don't put on any evidence, then you are instructed that if you find a reasonable doubt as to some of those elements, you know, that I didn't present enough evidence, will you be able to find him not guilty if you think the evidence was not sufficient?

PANELIST GERST: Yes, I would be able to.

Given these responses, the trial court did not err in failing to strike for cause venirepersons Wade, Menzel, Gerst and Hempen. *State v. Walton,* 796 S.W.2d 374, 377 (Mo. banc 1990). Point denied.

■ Defendant's second point contends that the trial court erred in refusing to admit the statements of two witnesses interviewed by Officer Marshall Poeschel that allegedly would have impeached Sistrunk's testimony regarding the time between the first and second visits Monty Ross made to Sistrunk's home on the evening of the attack. The defendant wished to have Officer Poeschel testify about the substance of interviews he conducted with two of Sistrunk's neighbors. Defendant hoped that the content of these statements would conflict with Sistrunk's testimony that five hours elapsed between the time of Ross' first and second visits to her home, thereby impeaching her.

The prosecution made a motion in limine to prevent the defense from asking Poeschel to repeat the actual substance of the witnesses' statements. The court sustained the motion on hearsay grounds, precluding defense counsel from asking Poeschel any questions regarding what anybody said as a result of his investigation. Defense counsel claimed that this testimony would be permissible because although it was hearsay, it would fall within the res gestae exception to the hearsay rule.

In reviewing a challenge to the failure of the trial court to admit certain testimonial evidence, we look to the question of prejudice, not merely to whether the trial court's decision was erroneous. *State v. Wilson,* 755 S.W.2d 707, 710 (Mo.App.1988). In the case at bar, however, we need not consider whether the defendant was prejudiced because the trial court did not commit error by declining to allow Officer Poeschel an opportunity to testify about the substance of hearsay statements that two witnesses/neighbors made to him at the time of his investigation after the attack on Sistrunk.

The res gestae exception to the hearsay rule refers to "those exclamations and statements made by either the participants, victims or spectators to a crime immediately before, during, or immediately after the commission of the crime, when the circumstances are such that the statements were made as a spontaneous reaction or utterance inspired by the excitement of the occasion and there was no opportunity for the declarant to deliberate and to fabricate a false statement." *State v. White,* 621 S.W.2d 287, 294–295 (Mo.1981), quoting *State v. Hook,* 432 S.W.2d 349, 352 (Mo. 1968). The trial court correctly ruled that the res gestae exception to the hearsay rule was inapplicable in the case at bar because the res gestae exception would require that the otherwise objectionable hearsay statements be made as a "spontaneous reaction or utterance inspired by the

excitement of the occasion." *Id.* Although the record does not provide us with the two witnesses' statements to Officer Poeschel, we can surmise that they were not given as part of a spontaneous reaction. Instead, the interviews that Poeschel conducted most likely allowed the witnesses/neighbors an opportunity to deliberate before making their statements.

Since we have determined that the trial court did not err in failing to allow the witnesses' hearsay statements contained in Officer Poeschel's investigation to be testified to by Poeschel, we need not reach the prejudice prong of our review. Point denied.

 Defendant's third and final point alleges that the trial court erred in allowing the state to present the rebuttal testimony of witness Curtis Sullivan since it did not rebut evidence presented by the defense. "Rebuttal testimony is any competent testimony that tends to explain, counteract, or refute evidence offered by the defense. *State v. Dizdar,* 622 S.W.2d 300, 302 (Mo. App.1981). The admission and scope of rebuttal testimony is generally discretionary with the trial court. *State v. Ramsey,* 710 S.W.2d 459, 461 (Mo.App.1986)." *State v. Oliver,* 791 S.W.2d 782, 788 (Mo.App. 1990).

In the case at bar, the prosecutor's case in chief relied on their witnesses establishing that the defendant had hired Monty Ross, the actual attacker, to injure Deborah Sistrunk. The defendant testified that he was shocked when Monty Ross told him that he had "killed the bitch." In rebuttal, Curtis Sullivan testified that the defendant told him on the evening of the attack on Deborah Sistrunk that he had a job for Monty Ross to do and that he didn't want Sullivan to get involved. Curtis Sullivan's testimony is proper rebuttal since it refuted the defendant's testimony. Point denied.

Judgment affirmed.

KAROHL and GRIMM, JJ., concur.